**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Dwight FERGUSON (91–3866); Dexter Thompson (91–3955); and Robert L. Shackelford (91–3954), Defendants–Appellants.**

Nos. 91–3866, 91–3954, 91–3955.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1994.

Decided May 3, 1994.

David A. Sierleja (argued and briefed), Office of the U.S. Atty., Cleveland, OH, for U.S.

John B. Gibbons (argued and briefed), Daniel T. Todt & Associates, Cleveland, OH, for Dwight Ferguson.

Donald Krosin (argued and briefed), Federal Public Defender's Office, Cleveland, OH, for Robert L. Shackelford.

Henry F. DeBaggis (argued and briefed), Cleveland, OH, for Dexter B. Thompson.

Before: KEITH, MARTIN and DAUGHTREY, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Dwight Ferguson, Dexter Thompson, and Robert L. Shackelford were convicted by a jury of conspiring to distribute and distributing cocaine and cocaine base. Raising numerous grounds, they appeal their convictions and the sentences imposed by the district court. We affirm the defendants' convictions, but reverse the sentences of Ferguson and Shackelford.

## I

This prosecution grew out of an undercover investigation conducted by the Lake County Narcotics Agency in Painesville, Ohio. In October 1990, Adam Noble was arrested by the Painesville Police Department on car theft and breaking and entering charges. To avoid prosecution, the nineteen-year-old Noble agreed to serve as a police informant. Over the next five months, Noble, accompanied by undercover police officer Scott Smith, regularly purchased cocaine from a wide-ranging assortment of individuals in Painesville and East Cleveland.

For drug sources, Noble turned to acquaintances of his common law brother-in-law, Dwight Ferguson. According to Noble, Ferguson managed the drug trade in the Lawnview area of Painesville during this five-month period. Noble characterized Arthur and Deborah Green, Dexter Thompson, and Robert Shackelford as suppliers, while describing Marvin Landingham, John Landingham, and Wyllyam Sheffey as Ferguson's "foot soldiers."

While working undercover, Noble and/or his partner bought two rocks of crack cocaine from Marvin Landingham on October 11, two rocks of crack cocaine from Sheffey on October 11, a half ounce of cocaine from Arthur Green on October 12, a half-ounce of cocaine from Deborah Green on October 17, an eighth of an ounce of cocaine from Ferguson on November 2, two rocks of crack cocaine from Sheffey on November 17, several rocks of crack cocaine from Thompson on January 4, 1991, and a half-ounce of crack cocaine from Thompson on January 17. Noble also negotiated to purchase, but never received, an eighth of an ounce of cocaine from Ferguson on January 7, a half ounce of crack cocaine from Shackelford on January 15, and a half ounce of crack cocaine from Shackelford on February 7.

While Noble dealt directly with Ferguson on only two of these occasions, he was able to tie Ferguson to two additional transactions. First, while not a participant, Ferguson was present during the October 11 Landingham sale. Noble testified at trial that, as he left Landingham's house, he passed Ferguson and spoke briefly with him about purchasing some powdered cocaine. Saying "later," Ferguson waved Noble off. Ferguson was also present during the January 4 Thompson

sale. When Noble approached Ferguson about purchasing an eighth of an ounce of crack cocaine, Ferguson directed Noble to Thompson. As Noble and Thompson negotiated the price, Ferguson commented that Noble deserved a deal because he was Ferguson's brother-in-law. Ferguson then collected Noble's money before Thompson turned over the crack.

In addition, Noble testified about a conversation he had with Deborah Green on October 17 in which Green related that she had spoken with Ferguson regarding problems he was having with John and Marvin Landingham. According to Green, Ferguson was upset because the Landinghams were smoking the crack they were supposed to sell for Ferguson.

During his testimony, Noble admitted that he never bought any drugs from Shackelford. Although Noble had been introduced to Shackelford on a previous social occasion, he was unable to match Shackelford's name and face until he saw Shackelford at trial. While working undercover, Noble had contact with Shackelford on three separate occasions. First, Noble testified that Shackelford sat in another room with a number of people while Noble purchased crack from Thompson on January 4. Second, Thompson referred Noble to his cousin "Shack" for the purchase of crack cocaine on January 15. A man who identified himself as Robb responded to the call placed to the pager number supplied by Thompson. As Noble negotiated the purchase, he commented favorably on his dealings with Thompson. Robb responded, "Dex is nobody. He gets his stuff from me." Joint Appendix at 289. The deal was never completed because Robb failed to appear at the agreed-upon location. Finally, on February 7, Noble dialed the pager number he had been given for Shack. Over the course of several telephone conversations, Noble and his undercover partner negotiated the purchase of crack cocaine with Robb. This deal also never came to fruition.

At trial, a customer service representative with U.S.A. Mobile Communications testified that Robert Shackelford had purchased four pagers, including the pager used by Thompson, during 1990. Officer Smith testified that he recovered the pager corresponding to the telephone number he and Noble had been given for Robb from Shackelford at the time of Shackelford's arrest.

On March 7, 1991, a federal grand jury returned a fourteen-count indictment against Arthur Green, Deborah Green, Ferguson, Marvin Landingham, John Landingham, Sheffey, Thompson, and Shackelford. Count One charged each defendant with conspiring to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841, 846. The remaining counts charged individual defendants with the distribution of cocaine and cocaine base, in violation of 21 U.S.C. § 841.

On May 30, Arthur and Deborah Green pled guilty to Count One, the conspiracy count. Three weeks later, John Landingham entered a plea of guilty to Counts One, Four and Six. Marvin Landingham subsequently pled guilty to Count One as well.

Ferguson, Sheffey, Thompson, and Shackelford proceeded to trial on June 24. Of the forty-eight people in the jury pool from which the petit jury was chosen, three were black. After one black juror was excused for cause, the government exercised its only peremptory challenge against the second black juror. The resulting petit jury had no black members.

Following an eight-day trial, the jury convicted Ferguson, Thompson, and Shackelford on all counts. Sheffey, who had been successful on a motion for a judgment of acquittal as to the conspiracy count, was found guilty of the remaining charges against him. On September 12, the district court sentenced Ferguson to a 135–month term of incarceration, to be followed by four years of supervised release. Shackelford was sentenced to a 121–month term of imprisonment and four years of supervised release on September 27. On October 3, the district court sentenced Thompson to a 78–month term of imprisonment, to be followed by four years of supervised release. This timely appeal followed.

**II**

Ferguson, Shackelford, and Thompson maintain that the evidence pre-

sented at trial was insufficient to sustain their conspiracy convictions. In addressing sufficiency of the evidence questions, this Court has long declined to weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *United States v. Evans*, 883 F.2d 496, 501 (6th Cir.1989). Instead, we look only to whether after reviewing "the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir.1992) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Even "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir.1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

■ In order to obtain a conviction under 21 U.S.C. § 846, "the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir.1990) (quoting *United States v. Stanley*, 765 F.2d 1224, 1237 (5th Cir.1985)), *cert. denied*, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991). While proof that Ferguson, Shackelford, and Thompson formally agreed to possess cocaine with the intent to distribute is unnecessary, *United States v. Barrett*, 933 F.2d 355, 359 (6th Cir.1991), the government must present "sufficient evidence to establish [each defendant's] connection [to the conspiracy] beyond a reasonable doubt." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986) (quoting *United States v. Batimana*, 623 F.2d 1366 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980)). All three defendants claim that the government failed to meet this burden.

■ Ferguson's challenge to his conviction must fail. Adam Noble testified that Ferguson controlled the drug trade in the Lawnview area and had lasting arrangements with several of the codefendants. Ferguson provided Noble with the names and telephone numbers of potential cocaine sources, including the Greens and Thompson. Moreover, Ferguson arranged and participated in the January 4 Thompson sale and was present during the October 11 Landingham sale. On this evidence, a reasonable jury could have concluded that Ferguson "was caught up in the affairs of the charged conspiracy." *United States v. Phibbs*, 999 F.2d 1053, 1064 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994).

■ Thompson's challenge is similarly without merit. Thompson sold crack cocaine to Noble on both January 4 and January 17. According to Noble's testimony, the January 4 sale was brokered by Ferguson, who handled the proceeds. Subsequently, Thompson put Noble in touch with Shackelford, making an introductory call to Shackelford on Noble's behalf and providing Noble with Shackelford's pager number. Thompson also used a pager provided by Shackelford to set up cocaine sales. This evidence, taken in the light most favorable to the prosecution, is sufficient to support Thompson's conspiracy conviction.

■ After carefully reviewing the record, we conclude that Shackelford's sufficiency of the evidence claim is also unavailing. Both Noble and Officer Smith testified at trial that they contacted an individual named Shack or Robb by pager and telephone regarding cocaine purchases. Officer Smith recovered this particular pager from Shackelford at the time of his arrest. In addition, the government introduced evidence establishing that the purchase orders and service contracts for Thompson's pager were in Shackelford's name, and that Robb informed Noble that he was Thompson's source for cocaine. Finally, Noble characterized Shackelford as a supplier, and testified that Shackelford came to Painesville on January 4 in order to sell drugs. This evidence, taken in the light most favorable to the prosecution, supports the jury's determination that Shackelford knew of, intended to join, and participated in the conspiracy.

## III

 Ferguson, Shackelford, and Thompson, who are black, argue that the prosecution's exercise of its only peremptory challenge against a black potential juror deprived them of their right to equal protection. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that the Equal Protection Clause prohibits purposeful racial discrimination in the selection of a jury. In order to establish a prima facie case of such discrimination, a "defendant must prove three things: 1) that the defendant is a member of a cognizable racial group; 2) that the prosecutor has exercised peremptory challenges against members of the defendant's race; and 3) that the relevant circumstances raise an inference of purposeful discrimination." *United States v. Peete*, 919 F.2d 1168, 1178 (6th Cir.1990) (citing *United States v. McCoy*, 848 F.2d 743, 745 (6th Cir.1988)). Once the defendant establishes a prima facie case, the burden shifts to the prosecution to present a neutral explanation for having excluded the jurors. *Peete*, 919 F.2d at 1178. This Court gives " 'great deference' to the district court's findings on the credibility of the prosecution's asserted neutral explanations." *Id.* at 1179 (citing *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1723 n. 21).

 Here, defense counsel raised a *Batson* objection after the government exercised its only peremptory challenge against a black juror, Mr. Spencer. While the defendants clearly meet the first two elements of the prima facie case, it is difficult to assess on the record before this Court whether they have raised the inference of discrimination necessary to meet the third component. *See United States v. Sangineto–Miranda*, 859 F.2d 1501, 1520–21 (6th Cir.1988) (setting forth factors to be considered in assessing inference of intentional discrimination, including racial composition of jury pool and final jury panel, number of peremptory strikes, race of those jurors struck or ex-

cused, and order of strikes). An inference of intentional discrimination does not arise merely because the prosecution used all of its peremptory challenges to exclude blacks. *Id.* Here, detailed information concerning the jury selection process and the district court's precise ruling are unavailable because the court reporter died before transcribing the jury selection proceeding.[1] It is clear, however, that the court denied defendants' motion for a mistrial.

 Even if the defendants made out a prima facie case of discriminatory exclusion, the government claims that it rebutted this showing by producing a neutral explanation for its challenge. According to the government, the prosecution excluded juror Spencer because Spencer indicated that he had been wrongly beaten by the police about twenty years ago. Again, on the record before this Court, it is impossible to discern whether this proffered neutral explanation is pretextual. *See Peete*, 919 F.2d at 1179–80 (reviewing factors relevant to analysis, including percentage of minority members in jury compared with jury pool, presence of minority members on the jury, pattern of defense strikes). Given the fact that this information was within the trial court's purview and this Court's broad deference to the district court's findings, *Peete*, 919 F.2d at 1178–79, we affirm the district court's denial of defendants' *Batson* challenge.

## IV

 Ferguson and Shackelford maintain that the district court attributed an excessive quantity of cocaine to them for sentencing purposes. The district court determined that each defendant was accountable for more than thirty-five grams of cocaine base—the entire amount of cocaine distributed by the conspiracy. Both defendants appeal this calculation, claiming that the government failed to present sufficient evidence to link them to the total amount distributed by the conspiracy.

---

1. Because of the court reporter's death, the parties prepared an account of the jury selection proceedings from recollection pursuant to Federal Rule of Appellate Procedure 10(c). The parties failed, however, to comply with Rule 10(c)'s

mandate to secure the district court's approval of such statements and proposed amendments thereto prior to submission of the record to this Court.

142

▉▉▉▉ The factual findings of a district court regarding the amount of cocaine for which a defendant is to be held accountable are accepted by this Court unless clearly erroneous. *United States v. Baro,* 15 F.3d 563, 568–69 (6th Cir.1994) (citing *United States v. Walton,* 908 F.2d 1289, 1300–01 (6th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990)). Where the amount is uncertain, the district court is encouraged to "err on the side of caution," and ensure that "the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which [he] is being held responsible." *Walton,* 908 F.2d at 1302; *see also United States v. Zimmer,* 14 F.3d 286, 290 (6th Cir.1994) (a district court "is not free to estimate the 'highest' number possible"). In arriving at a total quantity, the district court must "explicitly set forth the evidence on which it relies," and make specific findings that are supported by a preponderance of the evidence. *Baro,* 15 F.3d at .569.

Shackelford and Ferguson challenge the district court's conclusion that they are accountable for the total amount of crack cocaine involved in the conspiracy. Both defendants claim that they lacked knowledge of, and could not have foreseen, the scope of the entire conspiracy. Shackelford, moreover, contends that the government demonstrated that he was involved in the conspiracy only after January 15, when he first negotiated with Noble. At sentencing, the district court failed to make specific findings regarding the duration of the defendants' involvement and the scope of the criminal activity each agreed to undertake, apparently assuming that Shackelford and Ferguson could be held accountable for the total quantity of drugs involved in the conspiracy simply because they were convicted of conspiracy. J.A. at 324–27.

▉▉▉▉ In failing to address the question of foreseeability, scope of criminal activity, or duration of involvement, the district court erred. It is well established that "differentiation between co-conspirators is required." *United States v. Jenkins,* 4 F.3d 1338, 1347 (6th Cir.1993) (remanding case for resentencing where the district court failed to address

the scope of the criminal activity the defendant agreed to undertake), *cert. denied,* —— U.S. ——, 114 S.Ct. 1547, 128 L.Ed.2d 197 (1994). As this Court has emphasized, "because 'the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy,' a sentencing judge may not, without further findings, simply sentence a defendant according to the amount of narcotics involved in the conspiracy." *United States v. Okayfor,* 996 F.2d 116, 120–21 (6th Cir.) (quoting *United States v. Lanni,* 970 F.2d 1092, 1093 (2d Cir.1992)), *cert. denied,* —— U.S. ——, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993). Because the district court failed to make the necessary factual findings, we must vacate the sentences imposed on Shackelford and Ferguson.

▉▉▉▉ Shackelford also challenges the propriety of including negotiated, but never delivered, amounts of cocaine for purposes of establishing his base offense level. As this Court recently recognized:

a sentencing court is not automatically required to include the weight of an uncompleted transaction in the base offense level, but under Application Note One [to Guideline Section 2D1.4] is required to make findings with respect to the defendant's intent and ability to produce the negotiated amount. For offenses involving negotiation to traffic in a controlled substance, Application Note One requires the sentencing court to exclude from Guideline calculation the amount of drugs that it finds the defendant did not intend to produce and was not reasonably capable of producing.

*United States v. Gessa,* 971 F.2d 1257, 1263 (6th Cir.1992) (en banc) (citation omitted). Here, the district court explicitly declined to make such findings. Where a district court fails to articulate its reasons for believing that a defendant convicted of conspiring to distribute drugs both intended and had the ability to produce the negotiated amounts, a remand for . resentencing is appropriate. *Gessa,* 971 F.2d at 1265–66 (citing cases).

## V

■ Ferguson also argues that the district court improperly enhanced his sentence, pursuant to Section 3B1.1(b) of the Sentencing Guidelines, based upon its determination that he was a manager or supervisor of five or more participants. Under Section 3B1.1(b), a district court is directed to increase a defendant's offense level by three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). In determining whether Section 3B1.1 applies, the court may consider factors such as the defendant's "exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, ... and the degree of control and authority exercised over others." *Id.* at comment. (n. 3). This Court reviews the district court's factual determinations for clear error. *United States v. Gibson,* 985 F.2d 860, 865 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 2981, 125 L.Ed.2d 678 (1993).

■ Here, Noble testified that Ferguson was the manager of twenty to thirty "foot soldiers" who sold drugs in the Lawnview area. In this capacity, Ferguson obtained cocaine from suppliers such as the Greens to furnish street-level dealers like the Landinghams and Sheffey. Ferguson also brokered the January 4 Thompson sale and played a role in the October 11 Landingham sale. As four defendants pled guilty to the conspiracy count, the criminal activity clearly involved at least five participants. In light of this evidence, the district court properly found that a sentence enhancement was warranted under Section 3B1.1(b).

## VI

For the foregoing reasons, we affirm the convictions of Dwight Ferguson, Dexter Thompson, and Robert L. Shackelford. We reverse the sentences of Ferguson and Shackelford, and remand their cases to the district court for resentencing.