81 F.3d 161
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Darin AUSTIN, a/k/a Darnell Wiggins, a/k/a "D Baby"; David
Clements; and Jason Jarvis, Defendants-Appellants.
 Nos. 94-4220, 94-4238, 94-4278.
 United States Court of Appeals, Sixth Circuit.
 March 11, 1996.
 
 Before: BOGGS and DAUGHTREY, Circuit Judges; and McKEAGUE, District Judge.*
 PER CURIAM.
 
 
 1
 Darin Austin, David Clements, and Jason Jarvis appeal from their convictions and sentencing for armed bank robbery and conspiracy to commit armed bank robbery, in violation of 18 U.S.C. §§ 371, 924(c)(1), and 2113(a), (d) on a host of grounds. We affirm as to all issues and all defendants.
 
 
 2
 * A summary of the seven bank robberies charged in the indictment against the defendants is given below:
 
 
 3
 Date Bank Robbed
 1. July 22, 1993 National City Bank (NCB), Euclid, Ohio
 2. September 15, 1993 NCB, Cleveland, Ohio (Lorain Avenue)
 3. September 23, 1993 Third Federal Savings, Cleveland, Ohio
 4. October 18, 1993 NCB, Cleveland, Ohio (E. 40th St.)
 5. October 29, 1993 Dollar Bank, Cleveland, Ohio
 6. November 8, 1993 Dollar Bank, Cleveland, Ohio (same)
 7. November 27, 1993 Society National Bank, Cleveland, Ohio
 
 
 4
 * The first robbery at NCB occurred at about 2:40 p.m. Two men entered in dark sweat clothes, with bandanas across their faces, wearing ski masks and surgical gloves. They told everyone to lie on the floor. One of the men told the teller Rina Laspina to open her top drawer and give him the money. When she made a move as if to set off her bait alarm, the man said, "Don't touch that or I'll shoot you bitch. Go down open your bottom vault." When she made a move to set off her vault alarm he reiterated the warning. Knowledge of the location or existence of the bait and vault alarms is uncommon. Another robber took $3,000 in Canadian notes, including some red-colored notes. The robbers were seen leaving with a black plastic garbage bag filled with money.
 
 
 5
 Earlier that day, Darin "D Baby" Austin offered Joseph Jordan $500 to "rent" his station wagon. He told Jordan to report the station wagon stolen after he left. Between 2:00 and 2:30 p.m. that day, Austin and Ulysses ("Woog" or "Woogie") Braxton, while sitting in Jordan's station wagon, asked fifteen-year old Juwan Thomas to get his brother Andre Hall. Once Hall was located, Austin asked him, "Man, you got a pistol because we about to go Jack somebody?" At about 4:00 p.m. that day, Jordan saw Austin pull up in front of him in a small blue car. Austin was carrying a black plastic garbage bag. Austin approached Jordan and dumped some money out of the garbage bag, including some that was red-colored. Later, Jordan also saw David Clements and Braxton arrive at Austin's house driving a blue Cadillac with "D Baby" license plates.
 
 
 6
 On January 12, 1994, a teller who had seen the face of the driver of the station wagon parked outside the first bank when it was robbed identified a picture of Clements out of a group of 15 other pictures. Police had earlier recovered Jordan's station wagon about a quarter mile away from the NCB branch that was robbed. In the car were pieces of clothing that matched the description of the clothes worn by the robbers, including the gloves and ski masks. Austin's fingerprints were found in one of the gloves.
 
 B
 
 7
 The second bank was robbed using a similar method. Clements was acquitted of participating in this robbery.
 
 C
 
 8
 Early on the day of the third robbery, police arrested "D Baby" Austin at his parents' house on unrelated charges. The police obtained consent to search his third-floor bedroom from his step-father, the owner of the home. Police recovered three firearms, and two black "ninja-type" ski masks from Austin's room. They were identical to the masks recovered from Jordan's station wagon.
 
 
 9
 Later that afternoon, the third bank was robbed. Anthony "Ant" Robinson testified that he was the driver for this robbery. He also testified at trial that he had attended an instructional showing of the movie "Point Break" with Austin, Braxton and Jason Jarvis earlier in the summer of 1993. At this "Point Break" gathering, Braxton and Austin asked Robinson if he would like to rob banks with them. Austin and Braxton, by imitating the movie, developed a modus operandi for bank robbery, in which they trained Robinson and Jarvis. Using this modus operandi, Robinson, Braxton, Jarvis, and Clements met at Austin's house to plan the third robbery on the same morning Austin was arrested. Robinson provided various details of the third robbery that were corroborated by a number of other government witnesses, including individuals who had nothing to do with the conspiracy.
 
 D
 
 10
 Robinson testified that he, Braxton, Jarvis, and Gary Hobbs committed the fourth robbery. The defendants in this case were ultimately acquitted of this robbery, however. Robinson testified that Alfred "Alfie" Cade was allowed to help to plan this robbery, as he was becoming jealous of seeing his friends spend their ill-gotten gains.
 
 E
 
 11
 Robinson was arrested on unrelated charges the day of the fifth robbery. Four men using roughly the same modus operandi participated in this robbery. Two eyewitnesses saw Jarvis and Clements immediately after the fifth robbery. They were seen running from the bank with a bag to their getaway car.
 
 F
 
 12
 The sixth robbery saw the first injuries inflicted on a teller and on a robber. One teller was struck in the head by one of the robbers with what was probably a gun, and one of the robbers was shot by a bank security guard. Jarvis was admitted to the hospital with gunshot wounds later that same day. Michelle Orr testified that Jarvis told her that he had been wounded at a bank.
 
 G
 
 13
 The seventh and final bank robbery was conducted by Orr, Braxton, Hobbs, and Jarvis. It followed the same modus operandi, and the bank robbery even ended when one of the bank robbers called out "time!" This practice was followed in the robberies portrayed in the movie "Point Break," where the perpetrators tried to execute their bank robberies with military precision.
 
 H
 
 14
 An eighth potential bank robbery was aborted when an eyewitness observed Cade suspiciously looking into the window of a bank. A van then drove up containing Braxton, Jarvis, and Clements. The eyewitness managed to find a nearby police officer who ultimately stopped the van. Braxton, Jarvis, and Clements were then arrested. Each was either wearing the familiar black outfits used in the other robberies, or had such clothing nearby. Also in the van were three loaded semi-automatic pistols. Hobbs and Cade were arrested when they came that night to the police station to visit those who had been arrested. From an interrogation of Cade, the police learned about the possible involvement in the conspiracy of "Ant" Robinson and a person named "Del." "Del" turned out to be Austin's girlfriend, Adele Tucker. Tucker was a bank teller at the first bank that was robbed. She was the only teller to have refused a demand for money in the first bank robbery.
 
 
 15
 Cade, Tucker, Robinson, and Juwan Thomas testified before the grand jury, which returned an indictment of Austin, Clements, and Jarvis on charges of armed bank robbery and conspiracy to commit armed robbery, in violation of 18 U.S.C. §§ 371, 924(c)(1), and 2113(a), (d). After a trial, Austin was found guilty on 4 counts, and not guilty on 1 count. Jarvis was found guilty on 10 counts, and not guilty on 2 counts. Clements was found guilty on 8 counts and not guilty on 2 counts. Austin received a sentence of 262 months in prison, plus 60 months to run consecutively, all to be served concurrent with a sentence in a related case. Jarvis was sentenced to 96 years and 3 months in prison. Clements was sentenced to 74 years in prison. Each of these defendants timely appealed.
 
 
 16
 Other relevant facts are provided in the context of discussing the legal issues raised by Austin, Jarvis, and Clements. Each defendant's appeal is discussed separately, and this is the organization followed below; however, many of the same issues are raised by more than one defendant, so the discussion of Clement's and Jarvis's appeals is abbreviated.
 
 II. AUSTIN
 
 17
 Austin raises seven issues on appeal.
 
 A. Evidence Suppression
 
 18
 Austin argues that the firearms and ski masks obtained in a search of his apartment located in his parents' home should have been suppressed.[1] The district court, after a suppression hearing, denied Austin's motion to suppress. The burden is on Austin to show that some constitutional or statutory right was violated in order to have the evidence suppressed. Zalmanowski v. United States, 606 F.2d 673 (6th Cir.), aff'd, 445 U.S. 961 (1980). A district court's ruling on these matters will be upheld on appeal unless clearly erroneous. United States v. Moore, 917 F.2d 215, 223 (6th Cir.1990), cert. denied, 499 U.S. 963 (1991).
 
 
 19
 Austin's stepfather, Hardy Cole, gave consent for police to search the third floor of his house where Austin lived, which was a converted attic with no outside entrance. Cole said Austin paid rent, but had no idea how much, or if Austin did so consistently. Cole and Austin's mother owned the furniture on the third floor. The storage room across from Austin's bedroom was used by the family jointly. Cole and Austin never agreed that Cole could not go to the third floor. There were no locks or other obstacles preventing access from the second to the third floor. There were no kitchen facilities on the third floor. The electric bill came in Austin's mother's name. His mother often visited him there, and once told him when she found a gun on the third floor, that he was not allowed to keep the gun lying around. His mother also testified at his suppression hearing that she and her husband frequently searched for drugs on the third floor, which she thought was a common practice for parents who had children at home. Austin points out, however, that mail intended for him was addressed "upstairs."
 
 
 20
 The facts of this case are closely analogous to United States v. Hall, 979 F.2d 77 (6th Cir.1991), cert. denied, 507 U.S. 947 (1993). In Hall, this court upheld the validity of consent to search a room given by the owner, where the owner simply allowed the defendant to live there, the room was never locked, and the owner never entered the room after the defendant began living there. The defendant had bartered his labor on the owner's farm for the right to stay in the room. Id. at 78-79. Austin attempts to avoid the conclusion that his argument for suppression is barred by Hall by citing two cases from other circuits, United States v. Brown, 961 F.2d 1039, 1041 (2d Cir.1994), and United States v. Warner, 843 F.2d 401, 403 (9th Cir.1988). Both cases are readily distinguishable, however, because they hold that landlords cannot consent to the search of rented premises. The relationship between Austin and his parents is not an arms-length rental arrangement, and is more like the informal relationship in Hall. Austin argues that the common authority test established by the Supreme Court in United States v. Matlock, 415 U.S. 164 (1974), requires that his step-father have actually lived on the third floor, for his consent to search Austin's room to have been valid. Matlock does not create such a requirement. The test is common authority, not common occupancy. As the government points out, under Austin's view of Matlock, unoccupied rooms of a house would be completely unsearchable. The room of eight-year old child in a parent's house would also be a safe haven from police search, unless the child himself gave consent.
 
 
 21
 Granted, Austin is 25 years old, and probably has a greater expectation of privacy than an eight-year-old, but under the circumstances of this case, it is clear that Austin, whose bedroom was regularly searched by his mother, was living in the room subject to his parents' terms. As such, the consent of the owner of the house where Austin's bedroom was located was valid. Austin also cites United States v. Whitfield, 939 F.2d 1071, 1074-75 (D.C.Cir.1991), which is squarely on point. It holds that the consent given by a mother to search her 29-year old son's bedroom was invalid, even though the room was unlocked and the son may not have paid any rent. Whitfield could be distinguished in light of the regular searches by Austin's mother, but this appears to be a relatively insignificant distinction. We choose not to follow Whitfield, in light of our own circuit's holding in Hall, which we think controls this case.
 
 B. Peremptory Challenges
 
 22
 During jury selection, one black juror, a Mrs. Miller, indicated that she would have problems serving on the jury because she was a self-employed beautician who had no other source of income, but the court did not excuse her. Other jurors indicated that they had vacation plans, and the court decided to excuse them from service. Later, during the voir dire, the government chose to exercise one of its peremptory challenges to exclude Mrs. Miller. Before doing so, however, the government had passed on three separate opportunities to strike Mrs. Miller. Austin objected on the grounds of Batson v. Kentucky, 476 U.S. 79 (1986) (holding a racially discriminatory use of peremptory challenges by the prosecution violates the Equal Protection Clause), but the district court overruled the objection, finding no violation of Batson. The district court did not ask the government to provide a facially neutral reason for excluding Mrs. Miller. Nevertheless, the government provided one:
 
 
 23
 MR. KROSIN [Defense Counsel]: I might point out to the Court that the government exercised the first two of its six peremptories and then passed three times, and then after the defendants had exhausted their peremptories the government used its sixth and last, after three passes, to excuse juror number six [Mrs. Miller].
 
 
 24
 THE COURT: Okay. How many African Americans are on the jury?
 
 
 25
 MR. KROSIN: I believe the [African American portion of the] jury is constituted of one regular juror, that is juror number one, and the first alternate Miss Johnson.
 
 
 26
 THE COURT: Okay. I don't find that the exercise of one peremptory challenge by the government against an African American who had earnestly asked for--earnestly asked to be excused because of her employment situation constitutes any kind of a violation of the Batsen [sic ] case, but your objection is recorded for the record.
 
 
 27
 MR. ARBEZNIK [Prosecutor]: Yes, your honor. We thought that the defense was actually going to excuse Miss Miller and that's the reason why we were--we knocked her off, because we knew she had trouble, and she was going to be in trouble staying on the jury.
 
 
 28
 Austin argues that the three passes by the government on any opportunity to strike Mrs. Miller, and its failure to move to strike Mrs. Miller when she originally expressed her reservations about serving, show that the government's peremptory strike against Mrs. Miller violates Batson. Austin also objects to the district court's ruling on his Batson objection before the government had been given a chance to explain its use of the peremptory challenge at issue.
 
 
 29
 The Sixth Circuit gives "great deference" to a district court's findings on the credibility of a prosecutor's asserted neutral reasons for exercising peremptory challenges against members of a defendant's racial group. United States v. Ferguson, 23 F.3d 135, 141 (6th Cir.1994). Ferguson also establishes the requirements for a prima facie case of discrimination under Batson: (1) that defendant is a member of a cognizable racial group; (2) that the prosecutor exercised peremptory challenges against members of the defendant's race; and (3) that the relevant circumstances raise an inference of discrimination. Ibid. Once a prima facie case is made out by the defendant, the burden shifts to the prosecution to offer a neutral explanation for having excluded the jurors in question. Ibid. Here, Austin's claim falters because there are no circumstances here that raise the necessary inference of racial discrimination. One black person was left on the jury by the government, and another served as an alternate. And even if a prima facie case had been established, the prosecution did offer neutral reasons for striking Mrs. Miller--the government thought the defense would exclude Mrs. Miller, and the government wanted to accommodate Mrs. Miller's concerns about her livelihood. "[U]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed neutral." Kelly v. Withrow, 25 F.3d 363, 366 (6th Cir.), cert. denied, 115 S.Ct. 674 (1994). Given the great deference afforded to the district court in this situation, we hold that the mere fact that the district court ruled on the defendant's Batson objection before asking the government for an explanation is insufficient to warrant a reversal of Austin's conviction.
 
 
 30
 Also, neither the government's passing on striking Mrs. Miller three times, nor the government's failure to move to strike Mrs. Miller when she first expressed her concerns about jury service, can support the inference that the government was discriminating against Mrs. Miller on the basis of her race. The government could clearly have decided not to "waste" one of its peremptory challenges on Mrs. Miller, if it thought Austin was going to strike her. Passing and failing to strike her immediately are both actions consistent with a strategy of maximizing the usefulness of peremptory challenges.
 
 C. Severance
 
 31
 Austin argues that Jarvis's defense was antagonistic to him, and that the district court should have granted the motion Austin made for severance. In his opening statement, Jarvis's counsel indicated that the theory of his client's defense was going to be that Jarvis had been induced to become involved in the bank robberies by FBI Agent Robert Friedman. Evidence to support this theory was provided by government witness Joseph Jordan and Cleveland police detectives, Paul Scott and Joseph Krych. Austin moved for severance during and after trial. Austin claims he was prejudiced because his defense was that he was not involved in the robberies at all, and that Jarvis's defense was completely inconsistent. The government argues that Jarvis's defense should have been no surprise to Austin, as overt act number six of the superseding indictment against both of them charged that Jarvis called the Cleveland FBI to speak to agent Friedman. Thus, the theory behind the indictment was that Jason Jarvis, in order to further the conspiracy, was giving misleading information to the FBI as to which banks were going to be robbed by the conspirators. No pretrial motion was ever made to sever the cases by either Austin, or Clements, however.
 
 
 32
 Under these circumstances, Austin has waived his right to have his trial severed from that of Jarvis. A motion for severance, under Fed.R.Crim.P. 12(b)(5), must be made prior to trial. If it is not, it is waived, under Fed.R.Crim. 12(f), unless good cause for not making such a motion before trial can be shown. United States v. Garcia, 20 F.3d 670, 673 (6th Cir.1994), cert. denied, 115 S.Ct. 1120 (1995). To show good cause for not having made the motion earlier, the defendant must show that he was unduly surprised by an antagonistic defense. United States v. Ghazaleh, 58 F.3d 240, 243 (6th Cir.1995). Here, there was no surprise, as Austin should have known from the indictment that Jarvis had cooperated with the FBI to some extent.
 
 
 33
 Alternatively, the denial of the motion for severance here fell within the sound discretion of the district court. United States v. Critton, 43 F.3d 1089, 1098 (6th Cir.), cert. denied, 115 S.Ct. 1987 (1995). "Mutually antagonistic defenses are not prejudicial per se." Zafiro v. United States, 113 S.Ct. 933, 938 (1993). "[Fed.R.Crim.P.] 14 does not require severance even if prejudice is shown." Ibid. The proper inquiry focuses on whether failure to grant the motion for severance would "prevent the jury from making a reliable judgment about guilt or innocence." Ibid. Austin cannot make the strong showing of prejudice, United States v. Licavoli, 725 F.2d 1040, 1051 (6th Cir.), cert. denied, 457 U.S. 1252 (1984), that he needs to prevail. Austin cannot show the jury was confused. In this case, the jury convicted the defendants of some counts, but not others. This shows they were able to distinguish the evidence against each. United States v. Odom, 13 F.3d 949, 958 (6th Cir.1994).
 
 
 34
 D. Prejudicial Variance/Number of Conspiracies
 
 
 35
 Austin argues that he was prejudiced at sentencing because he was convicted of participating in one giant conspiracy that encompassed all of the separate bank robberies, whereas he was charged originally with only participaing in a limited number of robberies and in a conspiracy embracing the rest. He points out that he received no proceeds from the robberies that occurred after his arrest, and that he obviously did not actively participate in these robberies. The government, however, points out that Austin and Braxton were the "masterminds" behind the "Point Break" concept of the conspiracy--they recruited the co-conspirators, instructed them on what clothes to wear, how to deal with people in the bank, and how to wipe fingerprints from their weapons. Thus, the modus operandi Austin helped to create continued after his arrest.
 
 
 36
 Where a conspiracy contemplates a continuous purpose and continued performance of acts, it is presumed to exist until there is an affirmative showing that it has terminated. United States v. Hamilton, 689 F.2d 1262, 1268 (6th Cir.1982), cert. denied sub nom. Wright v. United States, 459 U.S. 1117 (1983). "[E]ach defendant need not have participated in each transaction." United States v. Andrus, 775 F.2d 825, 840 (7th Cir.1985). The evidence here must be considered in the light most favorable to the government. United States v. Moss, 9 F.3d 543, 551 (6th Cir.1993). Moreover, the fact that Austin was arrested before the conspiracy was halted by the police does not constitute a withdrawal by Austin from the conspiracy. United States v. Ramos, 861 F.2d 461, 465 (6th Cir.1988), cert. denied sub nom. Longmire v. United States, 489 U.S. 1071 (1989). Austin's attempt to distinguish United States v. Davenport, 808 F.2d 1212, 1215 (6th Cir.1987) (discussing drug distribution "chain conspiracies"), is thus unavailing. The difference between this bank robbery conspiracy and a "chain conspiracy" to distribute drugs has no significance here for determining whether the government varied its indictment against Austin to his prejudice. Austin has not made the affirmative showing necessary to prove that his participation in a conspiracy that he intended to continue had ended.
 
 E. Impeachment with Grand Jury Testimony
 
 37
 One of four recalcitrant government witnesses at trial was Adele Tucker. Austin's girlfriend and a teller at the first bank he robbed on July 22, 1993, the National City Bank. Tucker was subpoenaed to testify. During her testimony at trial, she contradicted her grand jury testimony that Austin had taken a teller "limit" sheet from her during her teller training. The government then informed both the court and the defendants that, if efforts to refresh Tucker's memory failed, she would be impeached with her prior grand jury testimony. Tucker continued to be recalcitrant--she told the court she wanted to go home, did not want to be in court, and that she was not the "subpoenaing type." Tucker was then shown her grand jury testimony and answered the questions put to her.
 
 
 38
 Three other witnesses, Juwan Thomas, Anthony Robinson, and Alfred Cade, also had trouble remembering their grand jury testimony, and they were handled similarly. Whenever the defense counsel for one of the defendants objected to this procedure, the district court overruled him, and allowed the grand jury testimony to come into evidence.
 
 
 39
 Most evidentiary rulings by a trial court will not be reversed absent a clear showing that the court abused its discretion. United States v. Taplin, 954 F.2d 1256, 1258 (6th Cir.1992). Here, the district court did not abuse its discretion in allowing the grand jury testimony of the recalcitrant witnesses to be admitted. Odom, 13 F.3d at 955, holds that there is no error in admitting previous grand jury testimony under Fed.R.Evid. 801(d)(1)(A),[2] as a prior inconsistent statement. Contrary to Austin's argument, failure to recollect is considered an inconsistency for the purposes of the rule. United States v. Distler, 671 F.2d 954, 958 (6th Cir.), cert. denied, 454 U.S. 827 (1981). See United States v. Owens, 484 U.S. 554, 563 (1988) ("It would seem strange ... to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony, see Rule 801(d)(1)(A), by simply asserting lack of memory of facts to which the prior testimony related.").
 
 F. Sufficiency of the Evidence
 
 40
 In considering the sufficiency of the evidence, a reviewing court must view the evidence and all inferences therefrom in the light most favorable to the government. A conviction will be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979). Austin makes three arguments that the evidence against him was insufficient to convict. First, he claims that Joseph Jordan, Juwan Thomas, Andre Hall, Adele Tucker, Anthony Robinson, and Alfred Cade were all unreliable witnesses. Second, he argues that no witnesses ever linked the weapons discovered in his third floor bedroom to any bank robberies. Third, he argues that an FBI fingerprint specialist who testified he saw a latent fingerprint on one of the plastic gloves recovered by police on July 22, 1993 from the getaway car used in one of the robberies was completely unreliable, as another government witness testified that he had never seen such a latent print with his naked eyes on a latex glove.
 
 
 41
 Austin forgets that it is for the jury to determine the credibility of witnesses. As Austin admits in his brief, "Extensive cross-examination by all counsel attached [sic ] the credibility of Messrs. Robinson and Cade by reasons of the criminal history and benefits promised." And if Austin failed to attack at trial the credibility of the other witnesses he now complains of, he has lost his opportunity to do so. The jury clearly credited the testimony of these witnesses despite the efforts at impeachment by the defense attorneys in this case.
 
 
 42
 Second, at least one of the specific weapons found in Austin's room was linked to the first bank robbery. A witness from this bank testified that a large silver revolver was used during the robbery, and a .44 caliber silver revolver that Austin admitted was his was recovered in the search of Austin's "apartment."
 
 
 43
 Third, Austin's attack on the credibility of the FBI fingerprint expert was made at trial, and the fingerprint evidence was not the only evidence or most significant evidence against Austin. For example, police tracked a recovered getaway car to its owner, and then to Austin. Austin was seen with a black garbage bag full of money, including red-colored Canadian notes, and a teller had seen one of the robbers with such a garbage bag, and another had given out red-colored Canadian bills to the thieves during the first robbery. A gun was used in this bank robbery. The bank robbers in the first robbery knew the location of the alarm buttons, and Adele Tucker testified she had given this information to her boyfriend, Austin. Anthony Robinson testified that he and others had been recruited by Austin to rob banks. Thus, there was more than enough to convict Austin of robbing the first bank, and of using a gun during the offense, and of participating in an ongoing conspiracy to rob banks.
 
 
 44
 G. Collateral Attack at Sentencing on Prior Conviction
 
 
 45
 Austin argues that his prior state conviction for arson was used at sentencing in violation of Boykin v. Alabama, 395 U.S. 238 (1969), in that he was not advised of his constitutional rights when he was convicted by that state. He attempts a collateral attack on his arson conviction on this basis for the purposes of challenging certain determinations made about his criminal history at his sentencing in this case. This tactic is clearly prohibited under United States v. Bonds, 48 F.3d 184, 186-87 (6th Cir.1995), which holds that a collateral attack on an earlier state conviction during a federal sentencing proceeding is impermissible. Austin, citing United States v. Burroughs, 5 F.3d 192, 194 (6th Cir.1993), argues that the discussion in that case of applying the holding of Custis v. United States, 114 S.Ct. 1732 (1994), to sentences imposed under the Guidelines is mere dicta and can therefore be disregarded by this court. He argues that Custis only holds that a defendant sentenced under 18 U.S.C. § 924(e) (the Armed Career Criminal Act), and not the Guidelines, may not collaterally challenge previous convictions. Austin is a bit late in presenting an argument that would only have helped the defendant in Bonds. Even if Custis does not require the result in Bonds, this does not serve to undo Bonds. Assuming again that Austin's analysis of Custis as dicta is correct, Bonds converted Custis 's dicta into the law of the Sixth Circuit. Therefore, Austin was properly found by the district court to be barred from collaterally challenging his previous state conviction for arson.
 
 III. CLEMENTS
 
 46
 Clements raises four issues on appeal.
 
 A. Peremptory Challenges
 
 47
 Clements raises the same Batson challenge that Austin does. Clements also argues, however, that the government's first explanation for its decision to wait to strike Mrs. Miller "defies reason," because "[i]f the government thought the defense was going to exclude the juror, then why would the government waste their own peremptory challenge to exclude the juror?" The answer is self-evident--because the government wanted to conserve its peremptory challenges so as to use them to maximum effect. It only used its peremptory challenge against Mrs. Miller when it became clear that the defendants were not going to exclude her. Clements's Batson challenge fails.
 
 B. Severance
 
 48
 Clements also argues that Jarvis's defense was antagonistic to his own defense. He offers basically the same arguments as Austin, and these are unavailing (particularly because Clements cannot show good cause for his failure to make a motion to sever before trial), with the exception of an attempt to distinguish Odom, 13 F.3d 949. Odom holds that there was no strong prejudice shown in the denial of a motion to sever where a co-defendant's acquittal shows that the jury was able to keep separate the evidence relevant to each particular defendant. Id. at 958. Clements argues that his case is distinguishable from Odom because the acquitted co-defendant in this case, Gary Hobbs, was not "fingered" by Jarvis, whereas he, Clements, was. It would be irrational, however, to limit the holding of Odom as Clements argues. If the jury's acquittal of a co-defendant implicated by an inconsistent defense gives rise to the inference that the jury properly separated the evidence against the co-defendants generally, then there is no reason why a similar, albeit weaker, inference could not be drawn from the jury's failure to convict one of the "fingered" co-defendants on some counts in a multi-count indictment.
 
 C. Impeachment with Grand Jury Testimony
 
 49
 Focusing on the testimony of Alfred Cade, Clements argues that the requirements of Fed.R.Evid. 801(d)(1)(A), relating to the admission of prior inconsistent statements, were not met. In neglecting to realize that a failure to recall can constitute an inconsistent statement under Distler, Clements makes the same error as Austin. Clements's argument about the improper inclusion of grand jury evidence fails.
 
 D. Sufficiency of the Evidence
 
 50
 The standard of review for Clements's sufficiency of the evidence challenge is the same as for Austin's challenge--considering the evidence in the light most favorable to the government, could any rational jury have found the elements of the crime beyond a reasonable doubt? Clements argues that there was insufficient evidence for the jury to convict him of participating in the third robbery on September 23, 1993 at the Third Federal Savings Bank in Cleveland. Government witness Anthony "Ant" Robinson testified that "Jason, Woog and Dave" jumped out of a van Robinson was driving and robbed that bank. Clements argues that Robinson never said that Clements was the "Dave" in question. In his grand jury testimony, Alfred Cade said that he had talked with Clements about participating in the September 23, 1993 robbery, but Cade never specifically identified Clements at trial. The government appeared to have made a mistake in failing to have Robinson point out Clements directly. The government attempted to correct its error on redirect, but Clements's objection to that line of questioning was sustained on the basis that the government was going beyond the scope of direct examination. Clements ignores other circumstantial evidence that links him to the crime, however. The "Dave" that Robinson mentioned was also 18-19 years old. Clements was arrested along with Braxton and Jarvis while wearing a dark jump suit like the one worn by the robbers, and also had rubber gloves like those used by the robbers. Finally, Clements was also the same height, 5'4"', as one of the robbers who jumped the counter in the September 23, 1993 bank robbery. From this evidence, the jury was entitled to infer that the "Dave" that Robinson referred to was David Clements. "Circumstantial evidence ... is intrinsically no different from testimonial evidence." United States v. Ingrao, 844 F.2d 314, 315 (6th Cir.1988) (quoting Holland v. United States, 348 U.S. 121 (1954)).
 
 IV. JARVIS
 
 51
 Jarvis raises two issues on appeal, the second of which raises two sub-issues.
 
 A. Impeachment with Grand Jury Testimony
 
 52
 Jarvis makes essentially the same argument here as Austin does, except that Jarvis recognizes that a failure to recollect can be inconsistency for hearsay analysis purposes under Distler. Focusing on the admission of the grand jury testimony of Alfred Cade, Jarvis argues that the district court became impatient with the process of first attempting to refresh the memory of the recalcitrant witnesses, then allowing the admission of previous grand jury testimony only to the extent that testimony was truly inconsistent with the testimony of those witnesses at trial. Cade's inability to recall the events of December 15, 1993, an insignificant portion of his testimony according to Jarvis, was used to "open the door" to using other parts of Cade's grand jury testimony. It was not an abuse of discretion for the district court to admit this evidence, however, because, while the evidence Cade provided against Jarvis in relation to the events of December 15, 1993 may have been insignificant in the overall scheme of the testimony that Cade provided against Jarvis, the events on this date were not insignificant in relation to Cade. Cade was arrested on that date for his participation in the bank robberies. From a failure to recollect what happened on that date, it was fair for the district court to conclude that Cade was being disingenuous. Furthermore, Cade was given enough time to read his entire grand jury statement, but refused to read more than half. Under the circumstances, there was no improper "opening of the door" without laying the proper factual predicates, or determining that the witness was truly being recalcitrant.
 
 B. Sentencing Issues
 1. Victim Enhancement
 
 53
 Jarvis was convicted for participating in the fifth robbery. Tony Riccio, one of the tellers working at the bank that was robbed, Dollar Bank, testified in the following fashion:
 
 
 54
 Q: Did there come a time in either of those robberies when you were struck?
 
 
 55
 A: Yeah, in the [October 23, 1993] robbery I was hit on the head.
 
 
 56
 Q: What happened?
 
 
 57
 A: When they were leaving the branch they were jumping over the counter and I was kneeling on the floor, and one of the men just--he had his gun, and as he was jumping over the counter just went like that and hit me on the head called me a couple of names, ran out.
 
 
 58
 Q: What did he call you?
 
 
 59
 A: Do you want me to say it?
 
 
 60
 Q: Yes, I want you to say it.
 
 
 61
 A: Just "bitch, whore," and hit me on the head.
 
 
 62
 Q: What did you do?
 
 
 63
 A: Nothing, I just sat there.
 
 
 64
 Based on this evidence, Jarvis's offense level for the relevant count of his conviction was enhanced by two levels, raising his sentencing range from 87 to 108 months to 108 to 135 months. He received a 135-month sentence on that count.
 
 
 65
 Jarvis argues that USSG § 1B1.1 App. Note 1(b) requires "bodily injury" to be either painful or significant enough that medical treatment would normally have to be sought as a result of being injured.[3] There is no evidence that Ms. Riccio ever sought medical treatment after being struck on the head, and there is no testimony that she experienced pain. Nevertheless, this argument does not avail Jarvis for a number of reasons.
 
 
 66
 First, it is "obvious" that someone struck on the head with a gun, unless their head is well-protected, will experience some degree of pain. It is true that the proof presented at a sentencing hearing must satisfy the preponderance of the evidence standard, United States v. Robison, 904 F.2d 365, 371 (6th Cir.), cert. denied sub nom. Smoot v. United States, 498 U.S. 946 (1990), but this standard is met where an assumption of pain is perfectly rational under the circumstances. Second, USSG § 1B1.1 App. Note 1(b) uses the word "e.g.," not the word "i.e.," suggesting that "significant injur[ies]" are not limited to those injuries that are "painful and obvious" or to those injuries requiring medical attention. Third, USSG § 2B3.1(b)(3) differentiates between "bodily injury," "serious bodily injury," "permanent, or life-threatening bodily injury," and various intermediate categories of injury.[4] Austin's argument from USSG § 1B1.1 App. Note 1(b) that any victim enhancement requires "significant injury" is tantamount to arguing that only "serious bodily injury" (from USSG § 2B3.1(b)(3)) or greater will justify a victim enhancement. This argument ignores the lesser category of "bodily injury" in USSG § 2B3.1(b)(3). Therefore, either there is some conflict between USSG § 2B3.1(b)(3)(A)-(E) and USSG § 1B1.1, App. Note 1(b), which we decline to resolve, as the question is not squarely presented, or the use of the word "significant" in USSG § 1B1.1, App. Note 1(b) refers only to injuries of the same or greater severity as those in USSG § 2B3.1(b)(3)(B)'s category of "serious bodily injury." Fourth, in any event, we do not write on a clean slate here. In United States v. Fitzwater, 896 F.2d 1009, 1012 (6th Cir.1990), this court held that there was no error in applying the victim injury enhancement to a defendant who had been convicted of aiding and abetting a bank robbery where the bank teller who was injured hit her head and hip after being told to get on the ground, and the defendant in question was in the getaway car outside the bank. And unlike the defendant in Fitzwater, Jarvis caused an injury to a teller personally, he was not merely the getaway car driver for another thief who told a bank teller to do something which caused injury to the teller. For these reasons we conclude that the district court properly applied a two-level victim enhancement to Jarvis's offense level.
 
 2. Criminal History Category
 
 67
 Jarvis maintains on appeal that the district court should have departed downward from a criminal history category III to a criminal history category II, because his juvenile convictions for drug abuse "unduly magnif[y]" the true nature of his offenses. A district court's refusal to depart downward is simply not reviewable on appeal. United States v. Brannon, 7 F.3d 516, 521-22 (6th Cir.1993). For this reason, Jarvis's citation to United States v. Nelson, 740 F.Supp. 1502, 1513 (D.Kan.1990), is inapposite, as that case merely shows that a district court may exercise its discretion to depart downward. What Jarvis would need to provide by way of authority is a court of appeals reversing a district court that refused to depart downward. This he could not possibly do.
 
 
 68
 Jarvis argues that the following statement indicates that the district court committed an error of law by ceding his authority to sentence Jarvis to the probation officer in the sentence report:
 
 
 69
 All right, I have reviewed the arguments over guideline application and I find that the guideline application, as made in the presentence report, is the correct one. Therefore, the criminal history category would be a 3 unless the court were to depart downward to a 2. And I find no reason in the report to depart downward to a 2, and therefore decline to do so.
 
 
 70
 (emphasis added). Jarvis's argument takes the district court too literally. Given that Jarvis objected on the same basis to the PSR as he does now on appeal, and the district clearly stated that it considered the arguments of both sides, it was not legally incorrect, or an improper cession of authority, for the district court to have stated that it also found no reason in the PSR itself to depart downward. Granted, it might have been analytically cleaner for the district court to have stated that it "found no reason in the report, or in the arguments of the parties, to depart downward," but this court certainly cannot say that the district court's locution warrants a remand for new sentencing of Jarvis.[5]
 
 V
 
 71
 The criminal sentences and convictions of Austin, Clements, and Jarvis are upheld on all grounds. The district court is AFFIRMED.
 
 
 
 *
 The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 When police searched Austin's room, they also discovered crack cocaine, crack cocaine cooking tubes, and other drug paraphernalia. Austin was indicted and convicted for violating 21 U.S.C. § 841(a)(1) by possessing crack with intent to distribute. A panel of this court has previously rejected his argument that the crack and crack-related evidence seized from his room should have been suppressed. United States v. Austin, 57 F.3d 1070, 1995 WL 358354 at * * 1--* * 2 (6th Cir.1995) (unpublished per curiam)
 
 
 [2]
 Federal Rule of Evidence 801(d)(1) provides in relevant part:
 Statements which are not hearsay. A statement is not hearsay if--
 (1) Prior statement by witness. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath at a trial, hearing, or other proceeding, or in a deposition....
 
 
 [3]
 "Bodily injury" is defined in the Guidelines as, "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought...."
 
 
 [4]
 USSG § 2B1.3(b)(3) provides, in relevant part:
 If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:
 Degree of Bodily Injury Increase in
 Level (A) Bodily Injury add 2
 (B) Serious Bodily Injury add 4
 (C) Permanent or Life"Threatening Bodily add 6
 Injury
 (D) If the degree of injury is between that specified in
 subdivisions (A) and (B), add 3 levels; or
 (E) If the degree of injury is between that specified in
 subdivisions (B) and (C), add 5 levels.
 
 
 [5]
 We also note that the district court appears to have erred in its calculation of the total amount of restitution owed by defendant Jarvis. The district court gave the total restitution owed by Jarvis as $57,462, when the correct total is $55,762. (Jarvis was specifically ordered by the district court to pay $11,980 to the Third Federal Savings and Loan, $29,745 to Dollar Bank, and $14,037 to the National City Bank.) The district court may want to consider correcting this apparent computation error sua sponte. Jarvis did not raise this issue in his appeal