*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0252P (6th Cir.)
File Name: 01a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

99-6561/6567
UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    *v.*

DAVID EARL CROZIER
(99-6561); CHARLES W.
BURTON (99-6567),
      *Defendants-Appellants.*

99-6629
UNITED STATES OF AMERICA,
      *Plaintiff-Appellant,*

    v.

CHARLES W. BURTON,
      *Defendant-Appellee.*

> Nos. 99-6561/
> 6567/6629

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 97-00154—James H. Jarvis, District Judge.

Argued: April 24, 2001

Decided and Filed:  August 2, 2001

Before:  MARTIN, Chief Judge; MOORE, Circuit Judge;
O'MALLEY, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:**  Randall E. Reagan, LAW OFFICES OF PETER
G. ANGELOS, Knoxville, Tennessee, Gary W. Lanker, LAW
OFFICE OF GARY W. LANKER, Memphis, Tennessee, for
Defendants.  Steve H. Cook, ASSISTANT UNITED STATES
ATTORNEY,  Knoxville,  Tennessee,  for  Plaintiff.
**ON BRIEF:**  Randall E. Reagan, LAW OFFICES OF PETER
G. ANGELOS, Knoxville, Tennessee, Gary W. Lanker, LAW
OFFICE OF GARY W. LANKER, Memphis, Tennessee, for
Defendants.  Steve H. Cook, ASSISTANT UNITED STATES
ATTORNEY, Knoxville, Tennessee, for Plaintiff.

MARTIN, C. J., delivered the opinion of the court, in
which MOORE, J., joined.  O'MALLEY, D. J. (pp. 27-29),
delivered a separate concurring opinion.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Chief Judge.  Following a bench
trial, the district court found David Earl Crozier and Charles
W. Burton guilty of conspiracy to distribute and conspiracy to
possess with intent to distribute controlled substances in
violation of 21 U.S.C. § 846.  Additionally, the district court
convicted Burton of possession with intent to distribute
Schedule II, Schedule III, and Schedule IV controlled

———————————

[*] The Honorable Kathleen M. O'Malley, United States District Judge
for the Northern District of Ohio, sitting by designation.

substances in violation of 21 U.S.C. § 841(a)(1); robbery of a pharmacy in violation of 18 U.S.C. §§ 2118(a) and (c); using a firearm during the commission of both the drug conspiracy and the robbery in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e). Both defendants appeal their convictions on numerous grounds. The United States cross-appeals the district court's sentencing decision to credit Burton with six hundred fifty days time served. For the following reasons, we affirm both defendants' convictions, vacate Burton's sentence, and remand for resentencing.

I.

A.

Because both defendants challenge the sufficiency of the evidence for their convictions, we must present the facts in some detail. For clarity, we have divided the facts according to discrete criminal activities.

1.    The Tennessee Rite-Aid Robbery

On November 26, 1995, two armed gunmen robbed the Rite-Aid Drug Store in Clinton, Tennessee, and absconded with numerous pharmaceutical drugs, including Schedule II, Schedule III, and Schedule IV controlled substances. During the robbery, one of the robbers (later identified as Burton) repeatedly asked Katrina DeBusk, the Rite-Aid pharmacist, about the location of several drugs, including Dilaudid pills and morphine. Several days after the robbery, DeBusk helped police prepare a composite sketch of the first suspect in about fifteen minutes. Police worked on a composite of the second suspect (again, later identified as Burton) for approximately three hours but failed to produce a sketch satisfactory to DeBusk.

Approximately one month later, DeBusk and Shelly Simonds, the only other Rite-Aid employee present during the robbery, separately identified Burton as one of the robbers

from a photographic line-up. The Clinton Police Department, which uses black-and-white mug shots, had obtained Burton's photograph from the Lexington, Kentucky, Police Department, which uses color mug shots. Accordingly, Burton's photograph was the only color photograph shown to the witnesses. On March 6, 1998, both witnesses again identified Burton as the perpetrator, this time from a live line-up. Burton was the only person represented in both the photo line-up and the live line-up.

Although neither witness was able to identify Crozier as Burton's accomplice during the robbery, Crozier's brother-in-law, Richard Randolph, testified at trial that in early December, Crozier showed him a bag containing bottles of pharmaceutical drugs and told him that Crozier and Burton had obtained the drugs by robbing a Tennessee drugstore.

2.    The Kentucky Drug Sales

In late November or early December 1995, in Lexington, Kentucky, Clayton Hobbs arranged for Burton to sell some drugs to Christopher Tucker. Hobbs drove Burton and an unidentified third man in a small car to Tucker's shop where Burton sold Tucker two boxes of pharmaceutical drugs. Tucker gave Burton $1,800 in one-hundred dollar bills. Tucker was unable to identify Crozier as the third man.

The next day, as previously agreed, Burton and Hobbs returned to Tucker's shop, where Tucker gave Burton an additional one thousand dollars in one-hundred dollar bills. Tucker testified that this time, Burton and Hobbs were in a Cadillac Eldorado. On December 1, Burton paid six hundred dollars cash to a pawn shop for his previously-pawned Cadillac Eldorado. The United States thus argues that although Tucker could not recall the exact date of the drug sale, the drugs must have been sold on November 30, with the follow-up payment occurring on December 1.

The majority opinion is correct, of course, that *Hill* addresses Article III of the IAD, and not Article IV, which controls this case. But, as the majority notes, "the procedural requirements are the same." Op. at [16 n.4]. Thus, the majority's assessment of whether the request for continuance by Burton's counsel meets the five requirements iterated in *Birdwell v. Skeen*, 983 F.2d 1332, 1336 (5th Cir. 1993), *see* op. at [15-17], is essentially irrelevant, in light of the Supreme Court's unanimous statement that the IAD's "'necessary or reasonable' continuance provision is . . . directed primarily, if not exclusively, to *prosecution* requests that have not explicitly been agreed to by the defense." *Hill*, 528 U.S. at 116 (emphasis added). That is not what happened in this case. On this point, moreover, I also must disagree with the conclusions reached by the majority regarding the meaning of footnote one in *Hill*. This footnote left open the question of whether, when the procedural requirements for a continuance under the IAD apply – such as when the prosecution requests the continuance – those requirements can be satisfied by an agreement in open court to a trial date outside the IAD's time limits. The language in this footnote did *not* reject, implicitly or otherwise, the conclusion that such an agreement *would* constitute a waiver where the prosecution has made no request for a continuance. Indeed, the very holding of *Hill* is that a waiver does occur in precisely those circumstances.

In sum, I believe Burton affirmatively and knowingly waived his right to a speedy trial within the time limits set out in the IAD when he asked for a continuance. Accordingly, I can agree only with the result reached by the majority in Part III of its opinion, and not with their reasoning.

treatment inconsistent with the IAD's time limits, and then recanting later on. Nothing in the IAD requires or even suggests a distinction between waiver proposed and waiver agreed to.

*Id.*

Notably, in *Hill*, it was the *prosecutor* who asked for a continuance; the trial court then asked defense counsel if he objected, and defense counsel said "that will be fine." *Id.* at 113. This case presents facts supporting Justice Scalia's reasoning even more strongly – defendant Burton's counsel asked for the continuance himself. Burton's counsel made this request, moreover, close to the trial date and relatively close to the running of the IAD's 120-day time clock. Now, having received what he asked for, Burton argues the trial court erred by failing to comply with the IAD, and the majority agrees with him. I cannot join that reasoning, concluding that to do so would be contrary to the letter and spirit of *Hill*. *See also United States v. Eaddy*, 595 F.2d 341, 344 (6th Cir. 1979) ("the substantive rights accorded to a prisoner under Article IV [of the IAD] may be waived, even though the prisoner is not aware of those rights, where there is an affirmative request to be treated in a manner contrary to the procedures prescribed in Article IV(c) or (e)").

I believe, moreover, that the majority opinion has the effect of setting a potential trap for district court judges who respond sympathetically to a defendant's request for a continuance. If a defendant seeking a continuance does *not* want to waive his IAD speedy trial rights, the onus should be on the defendant to make this clear, not on the district court to ensure that the continuance is only for that narrow window of time after the originally scheduled trial date and before the 120-day period expires. Indeed, the ultimate effect of the majority opinion is to urge district court judges to deny even the most well-taken motion for continuance filed by any defendant whose presence is procured via detainer.

### 3. Casing the Lexington, Kentucky, Rite-Aid

At approximately 4 p.m. on December 1, security personnel for the Rite-Aid Drug Store in Lexington observed Burton and Crozier enter the store together, walk around separately, and eventually meet up at the pharmacy. Burton made a purchase and left the store, only to return a short time later, stay awhile, then leave. Burton again returned and after fifteen or twenty minutes, met up with Crozier. The two split up again, ultimately leaving the store separately. A short while later, Burton again returned, and spent approximately five minutes paying particular attention to the cash registers' and employees' locations. Crozier also re-entered the store but remained near the front. Burton finally ended this episode by placing a Tylenol bottle in his pocket. When confronted by security, a fight ensued, resulting in Burton's arrest and Crozier fleeing the scene. Police found syringes, $1,557 in cash (including fifteen one-hundred dollar bills), and a number of Dilaudid pills on Burton. Shortly after Burton's arrest, his girlfriend pawned two handguns, one of which matched the description DeBusk had given of the gun she saw during the Tennessee Rite-Aid robbery.

On December 6, police officers executed a parole violation warrant on Burton. It was while Burton was being held on that charge that the Lexington Police Department forwarded Burton's color mug shot to the Clinton Police Department in Tennessee. Burton remained incarcerated for parole violations for the remaining time relevant to this appeal.

### 4. The Somerset, Kentucky, Drugstore Burglary

On February 8, 1996, Randolph and Crozier's son, Brett, burglarized a Somerset, Kentucky, drugstore and brought the drugs to Crozier. Some of those drugs were then taken to Clayton Hobbs, while Crozier, Randolph, and a man named Charlie Henderson sold the morphine obtained in the burglary to someone in Georgetown, Kentucky, for one thousand dollars.

During the time relevant to this appeal, Crozier was living on Limestone Street in Somerset, while Crozier's wife lived on White Street. Although Crozier often visited and occasionally stayed overnight at his wife's home, he maintained his own residence. On February 12, police officers executed search warrants at both the Limestone Street and White Street residences. The search of Crozier's Limestone Street residence revealed one bottle of pharmaceutical drugs and a ledger reflecting indebtedness to Crozier by Burton for one thousand dollars, and by "Clayton" for eight hundred dollars. The search of Crozier's wife's White Street residence revealed two bags containing a large number of pharmaceutical drugs in wholesale-sized bottles, and eight-hundred forty-five dollars in Crozier's wallet. Some of those bottles were traceable to the Somerset drugstore and others were consistent with drugs taken during the Tennessee Rite-Aid robbery. Although Crozier was present at the White Street address during the search, Crozier's fingerprints were not found on any of the seized booty.

B.

The grand jury in the Eastern District of Tennessee, in a second superseding indictment, charged Burton and Crozier with conspiracy to distribute and conspiracy to possess with intent to distribute controlled substances; possession with intent to distribute Schedule II, Schedule III, and Schedule IV controlled substances; robbery of a pharmacy; using a firearm during the commission of both the drug conspiracy and the robbery; and being felons in possession of firearms.

The United States initially brought Burton into Tennessee by serving a writ of *habeas corpus ad prosequendum* on the Kentucky prison where Burton was incarcerated. In April 1996, the United States agreed to return Burton to Kentucky pending trial. On September 10, the United States filed a detainer with the Kentucky prison, officially informing it that Burton had federal criminal charges pending in the Eastern

———————————

**CONCURRENCE**

———————————

KATHLEEN McDONALD O'MALLEY, District Judge, concurring. I concur with most of the reasoning in the majority opinion, and with the result reached. For the reasons stated below, however, I cannot agree with the reasoning contained in Part III of that opinion, where the majority concludes that "the district court erred by failing to comply literally with Article IV(c)" of the Interstate Agreement on Detainers Act ("IAD"). Op. at [12].

In my view, this case is clearly controlled by *New York v. Hill*, 528 U.S. 110 (2000), and, as such, Burton's counsel's affirmative request for a continuance *did* constitute a waiver of the IAD's time limits. In *Hill*, counsel for the defendant "agree[d] to a specified delay in trial." *Id.* at 115. This agreed-to delay caused the defendant's trial to begin after the speedy trial time limit set out in the IAD. The Supreme Court unanimously concluded that defense counsel's agreement to the late trial date bound his client, because "[s]cheduling matters are plainly among those for which agreement by counsel generally controls." *Id.* The high Court expressly *rejected* the view that a defendant's waiver of IAD speedy trial rights must be done "explicitly or by an affirmative request for treatment that is contrary to or inconsistent with those speedy trial rights," *id.* at 118, holding instead that mere "assent to delay" is sufficient, *id.* at 114. Justice Scalia's reasoning applies squarely to this case:

We agree with the State that this [a requirement that a defendant must explicitly ask for treatment inconsistent with his rights under the IAD before waiver may be found] makes dismissal of the indictment turn on a hypertechnical distinction that should play no part. As illustrated by this case, such an approach would enable defendants to escape justice by willingly accepting

Accordingly, we vacate Burton's amended sentence and remand with instructions to reinstate his original sentence.

VII.

For the forgoing reasons, we AFFIRM the district court on all grounds except Burton's sentence. We VACATE Burton's amended sentence and REMAND with instructions to reinstate Burton's original sentence.

District of Tennessee. On November 20, Burton was returned to the Tennessee district by means of a second writ of *habeas corpus ad prosequendum.*[1]

Following a three-day bench trial, the district court found Burton guilty on all counts and sentenced him to forty-six years and ten months imprisonment, plus six years supervised release, to be served following completion of Burton's previously imposed Kentucky prison sentence. Additionally, the district court granted Burton six hundred fifty days credit for the time he had spent in Tennessee awaiting trial. The district court found Crozier guilty of only the conspiracy charge and sentenced him to seventeen years and eleven months imprisonment, plus three years supervised release. Burton and Crozier timely appealed their convictions on numerous grounds. The United States timely cross-appealed Burton's award of credit for time served.

II.

Burton first argues that the district court erred in failing to suppress DeBusk's and Simonds's pre-trial and in-court identifications of him as one of the Tennessee Rite-Aid robbers. We review a district court's factual findings on a motion to suppress for clear error, and its legal conclusions de novo. *See United States v. Freedman*, 209 F.3d 464, 466 (6th Cir. 2000).

Due process "prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable

---

[1]The record does not reflect when Burton actually arrived in the Eastern District of Tennessee. Burton contends that he arrived on November 20, 1998, while the United States argues that his earliest documented appearance was in January, 1999, and neither party conceded the issue at oral argument. Because we reject Burton's argument that his trial violated the Interstate Agreement on Detainers on other grounds, we will construe any ambiguity as to Burton's arrival date in his favor for purposes of this appeal.

misidentification." *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000). Therefore, a conviction based on identification testimony must be overturned "whenever the pretrial identification procedure is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). An identification is admissible if reliable, even if obtained through suggestive means. *See Neil v. Biggers*, 409 U.S. 188, 196-97 (1972).

This Circuit follows a two-step analysis in determining whether an identification is admissible. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994). First, we consider whether the identification procedure was suggestive. *See id.* at 1071. If we find the procedure was suggestive, we then determine whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible. *See id.* The five factors to be weighed in determining reliability are: 1) the opportunity of the witness to view the perpetrator during the crime; 2) the witness's degree of attention to the perpetrator; 3) the accuracy of the witness's prior descriptions of the perpetrator; 4) the level of certainty demonstrated by the witness when identifying the suspect; and 5) the length of time between the crime and the identification. *See Biggers*, 409 U.S. at 199-200. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)

We agree with the district court that including one color photograph of Burton with a group of black-and-white photos was suggestive. *See United States v. Ayendes*, 541 F.2d 601, 605 (6th Cir. 1976) ("It is clear that the procedure of using a display composed of three typical black and white mug shots, a single color picture of each of the defendants . . . and a color group photograph in which both of the defendants appeared was suggestive."); *see also O'Brien v. Wainwright*, 738 F.2d 1139, 1140 (11th Cir. 1984) (holding that display of defendant's color photo with five other black-and-white mug

served is a question of law which we review de novo. *See United States v. Wilson*, 916 F.2d 1115, 1117 (6th Cir. 1990), *overruled on other grounds*, 503 U.S. 329 (1992).

The United States is correct in asserting that the power to grant credit for time served lies solely with the Attorney General and the Bureau of Prisons. *See* 18 U.S.C. § 3585(b); *United States v. Wilson*, 503 U.S. 329, 333 (1992). Nonetheless, Burton argues that the district court did not award him credit for time served under 18 U.S.C. § 3585(b). Rather, he claims it implicitly applied Section 5G1.3(c) of the Sentencing Guidelines and allowed Burton to serve six hundred fifty days of his federal sentence concurrent with his state prison term. *See United States v. Dorsey*, 166 F.3d 558, 560 (3d. Cir. 1999) (interpreting district court's power to award partially concurrent sentence under § 5G1.3(b) as not conflicting with Bureau of Prison's authority under 18 U.S.C. § 3585(b) to award credit for time served).

The sentencing hearing transcript belies Burton's assertion that the district court intended to award a partially concurrent sentence. The district court quite clearly imposed the sentences to run consecutively, but then responded to what it considered an inappropriate refusal by the United States to approve at the sentencing hearing six hundred fifty days credit on Burton's forty-six year and ten month prison sentence. Although the United States informed the district court that only the Bureau of Prisons has the power to award credit for time served, the district court responded that such a lengthy sentence imposed on a man of Burton's age is effectively a sentence of life imprisonment, and expressed frustration at its inability to grant Burton even the Pyrrhic victory of six hundred fifty days credit for time served. Accordingly, it amended Burton's sentence to include credit for the time he spent awaiting trial in Tennessee. We sympathize with the district court's frustration, but the law is clear. Credit for time served may be awarded only by the Bureau of Prisons, and the district court erred in granting the credit itself.

### V.

Crozier also argues that his acquittal on the Tennessee Rite-Aid robbery count shows that the Eastern District of Tennessee was an improper venue in which to try him. The United States must prove by a preponderance of the evidence that venue was proper as to each count. *See United States v. Scaife*, 749 F.2d 338, 346 (6th Cir. 1984). Venue is proper in the state or district where the offense was committed. *See id.* For drug conspiracies, venue is proper in any district where the conspiracy was formed or where an overt act in furtherance of the conspiracy was performed. *See id.* "A conspiracy defendant need not have entered the district so long as this standard is met." *Id.*

The United States argues that Crozier failed to raise the venue issue prior to the district court's verdict and has thus waived it. In response, Crozier points to the trial transcript, where the United States responded to Crozier's Rule 29 motion to dismiss for insufficient proof at the end of the United States's case. The United States argued to the district court that it had to show only "by a preponderance of the evidence" an overt act committed in Tennessee, and Crozier now suggests that the United States could only have been arguing the propriety of venue. In light of the United States's arguments to the district court, we will assume that Crozier properly preserved the venue issue. Nonetheless, we find against him on the merits of his claim. Burton took an overt action in the Eastern District of Tennessee in furtherance of the drug conspiracy when he robbed the Clinton, Tennessee, Rite-Aid. Accordingly, venue in that district was proper as to all co-conspirators, including Crozier.

### VI.

The United States argues on cross-appeal that the district court erred in awarding Burton six hundred fifty days credit for the time he spent awaiting trial on the instant charges. Whether a district court has the power to award credit for time

shots was impermissibly suggestive). Applying the five *Biggers* factors, however, we conclude that, under the totality of the circumstances, the district court properly found that sufficient indicia of reliability existed to admit both witnesses' identification testimony.

First, the district court found that both witnesses had an extended opportunity to view the robber later identified as Burton. The robbery took place during daylight hours in a well-lit building over a ten-minute period. Burton did not wear a hat, mask, or glasses, and did not have facial hair. Simonds testified that approximately one hour before the robbery, she helped Burton locate and purchase a box of cough drops.[2] She took note of Burton at the time because he was a stranger, and she was familiar with most of her customers. Burton returned to the store and approached Simonds for help locating a birthday card for his mother. When she turned to push a cart out of his way, Burton poked "something" into her back and forced her to the pharmacy area. DeBusk testified that while Burton's accomplice grabbed various drugs, Burton carried on an extended conversation with DeBusk regarding the locations of particular narcotics. Although DeBusk was bound and lying on the floor, she testified that she had a clear view of Burton when she raised her head to speak with him. We agree with the district court that this factor presents an indicium of independent reliability.

Second, the district court found that both DeBusk and Simonds viewed Burton with a heightened degree of

---

[2]Without citing any case law, Burton contends that *Biggers* requires us to consider Simonds's opportunity to view Burton only during the robbery. Burton's argument presents an overly narrow view of the reliability test. In determining whether an identification was reliable, it is material whether the witness was familiar with the defendant, because the more familiar the person, the more reliable the identification. Therefore, we find that the district court properly considered Simonds's pre-robbery opportunities to view Burton.

attention, as compared with "disinterested bystanders or casual observers." The court noted that Burton confronted both witnesses directly, and that as victims of the crime, both would have likely paid close attention to Burton and his accomplice, particularly because the presence of a gun indicated the potential for violence. Although Burton presented expert testimony to show that victims tend to be less reliable witnesses than disinterested parties, particularly when threatened with a weapon, the district court properly acted as fact-finder in choosing to credit DeBusk's and Simonds's testimony over, or in spite of, the expert's generalizations. We agree with the district court and find an indicium of reliability under this factor as well.

Third, the district court discussed the accuracy of the prior descriptions. DeBusk worked with police on a composite of the robber later identified as Burton which, although never completely satisfactory to DeBusk, is consistent with Burton in several respects, including wide-set eyes, thin lips, similar hair, and similarly shaped heads. DeBusk initially described the robber as approximately six feet tall and one hundred eighty pounds. Although Burton has a height of six feet and one inch, he weighs two hundred forty pounds — sixty pounds heavier than DeBusk's description. Nonetheless, the district court agreed with the magistrate that DeBusk's viewing Burton while lying on the floor could explain the weight discrepancy, and decided the discrepancy should go to the credibility of DeBusk's testimony, rather than warranting its outright exclusion. We agree with the district court that the sixty-pound weight discrepancy does not operate to bar DeBusk's testimony, but rather must be taken in conjunction with her entire description of the robber later identified as Burton.

We disagree, however, with the district court's application of this factor to Simonds. The district court noted that Simonds had not provided police with a description of the robber prior to viewing the suggestive photo line up, and found that therefore it "could not consider the third factor"

be reasonably construed only as supporting a finding of two separate conspiracies (one involving Burton, Clayton Hobbs, and Christopher Tucker, and another involving Crozier, Richard Randolph, and Crozier's son, Brett) which is fatally inconsistent with the indictment charging only one conspiracy. To obtain a reversal due to a variance between the indictment and the evidence, Crozier must show 1) the variance itself, and 2) an effect on a substantial right. *See United States v. Kelley*, 849 F.2d 999, 1002 (6th Cir. 1988). Whether one conspiracy or two conspiracies were shown is a question of fact, which we review in the light most favorable to the United States. *See id*.

The United States introduced evidence that Burton and Crozier knew each other and cased a Rite-Aid together. Randolph testified that Crozier admitted robbing a drugstore in Tennessee with Burton. After Randolph and Brett burglarized the Somerset drugstore, they brought the drugs to Crozier, and some of those drugs were eventually sold to Clayton Hobbs. Crozier possessed pharmaceuticals consistent with some of the Tennessee robbery booty. Finally, a ledger reflected that Burton owed Crozier one thousand dollars and "Clayton" owed Crozier eight hundred dollars. Taking the evidence in the light most favorable to the government, we find that this proof was sufficient to show one conspiracy, as charged in the indictment.

---

indictment against him").

Crozier next contends that the district court erred in "rely[ing] upon wrongfully admitted hearsay evidence" that he resided at his wife's White Street residence when it determined that Crozier possessed and had control over the drugs found in his wife's home. Even assuming that the district court admitted hearsay evidence on the issue, Crozier does not cite to anything in the record to show that the district court in fact relied on such evidence, and thus his assertion that *Moore v. United States*, 429 U.S. 20 (1976), controls is incorrect. *See id.* at 21 (vacating conviction on grounds that trial judge "expressly relied on the hearsay declaration").

Moreover, even without the testimony that Crozier lived at his wife's White Street home, there was plenty of other evidence that Crozier frequented her house, often as an overnight guest. In fact, during the search, Crozier was found sleeping on the same side of the bed where police located the bag of drugs. One of the officers testified that he saw Crozier reach into the area where the drugs were found before police ordered him off the bed and secured him. Although Crozier presented testimony contradicting the officer's recollection, the district court could have chosen not to credit that testimony. Therefore, Crozier has failed to prove that the court relied on any inadmissible hearsay evidence to find that Crozier possessed and had control over the drugs recovered from his wife's home.

Finally, Crozier argues that his indictment must be dismissed because of a fatal variance between the indictment and the proof at trial.[6] Crozier argues that the evidence can

_____

Therefore, we decline to decide this issue today.

[6]The United States argues that Crozier failed to raise this at the district court, and thus has waived the issue. We have previously noted, however, that defense counsel does not waive objection to a variance by failing to raise it at trial. *See United States v. Beeler*, 587 F.2d 340, 343 (6th Cir. 1978) (quoting the Supreme Court's statement that "a court cannot permit a defendant to be tried on charges that are not made in the

with respect to Simonds. The purpose of looking to prior identifications is to find an indicium of reliability. If Simonds failed to describe Burton before being presented with his photo in a suggestive manner, that fact should not be ignored, but rather cuts in favor of Burton's argument that Simonds identified him merely because of the suggestive photo line up. Therefore, although the district court was correct in finding DeBusk's description taken as a whole provided an additional indicium of reliability, it should have found that Simonds's failure to describe Burton previously indicates a measure of unreliability in her identification.

Fourth, both DeBusk and Simonds picked Burton as the robber within five seconds of viewing the photo line-up. Moreover, both immediately identified Burton at a live line-up (albeit one that was held over two years after the robbery and three days before the suppression hearing) and in court. Finally, both testified that their live line-up and in-court identifications were based on what they saw during the robbery, not because of the photographic line-up. The district court noted that the magistrate found both DeBusk and Simonds "to be quite certain of their identification of defendant." This factor shows a further indicium of reliability.

Finally, the district court found the length of time between the crime and the identification to cut in favor of the defendant. One month had passed between the robbery and the impermissibly suggestive photographic line up. More than two years passed before the live line up occurred. *See, e.g., United States v. Hamilton*, 684 F.2d 380, 383 (6th Cir. 1982) (finding eleven-day lapse between crime and identification acceptable). Nonetheless, the district court weighed all of the factors and found that the United States had shown that the suggestive nature of the photographic line up did not create a very substantial likelihood of misidentification. *See United States v. Hill*, 967 F.2d 226, 233 (6th Cir. 1992) (finding lapse of five years did not operate to bar identification supported by other indicia of reliability).

We agree with the district court that, taken as a whole, the facts do not show a "very substantial likelihood" that Burton was misidentified.

### III.

Next, Burton argues that his right to be tried within one hundred twenty days of his arrival in Tennessee was violated and thus his indictment must be dismissed with prejudice under the Interstate Agreement on Detainers, 18 U.S.C. App. 2 (2000). The United States argues that the Interstate Agreement was not violated, and raises several procedural arguments that it claims preclude us from adjudicating this issue. We conclude that the district court erred by failing to comply literally with Article IV(c), but that the error did not prejudice Burton and thus does not require reversal.

### A. Interstate Agreement on Detainers

The Interstate Agreement is a compact entered into by forty-eight states, the United States, and the District of Columbia to establish procedures for resolution of one jurisdiction's outstanding charges against another jurisdiction's prisoner. *See New York v. Hill*, 528 U.S. 110, 111 (2000). A detainer "is simply a notice to prison authorities that charges are pending against an inmate elsewhere, requesting the custodian to notify the sender before releasing the inmate." *Ridgeway v. United States*, 558 F.2d 357, 360 (6th Cir. 1977). The United States need not file a detainer in order to obtain custody over a state's prisoner. *See United States v. Mauro*, 436 U.S. 356, 357-58 (1978) (noting "the statutory authority of federal courts to issue writs of *habeas corpus ad prosequendum* to secure the presence, for purposes of trial, of defendants in federal criminal cases then in state custody, has never been doubted"). Thus, it is not necessarily bound by the Interstate Agreement on Detainers' requirements. *See id.* at 349 (holding writs of *habeas corpus ad prosequendum* are not "detainers" within the meaning of

owed him one thousand dollars, and that "Clayton" (presumably Clayton Hobbs) owed him eight hundred dollars; 4) a large quantity of pharmaceutical drugs in wholesale bottles, consistent with some of the drugs taken during the Tennessee Rite-Aid robbery, were found in Crozier's wife's house; and 5) Richard Randolph, Crozier's brother-in-law, testified that Crozier told him that Crozier and Burton had obtained a number of pharmaceutical drugs during a Tennessee drugstore robbery. This evidence, though all of it circumstantial, was sufficient to allow the district court to find that Crozier was guilty of conspiracy beyond a reasonable doubt.

Crozier argues that the verdict, convicting him of conspiracy but acquitting him of the substantive criminal acts, was fatally inconsistent. Otherwise, Crozier contends, he should have been convicted for all of the other offenses, as they were committed by a co-conspirator during and in furtherance of the conspiracy. *See United States v. Odom*, 13 F.3d 949, 959 (6th Cir. 1994). The United States counters that the verdicts are not necessarily inconsistent, because the district court could have found that Crozier supported the conspiracy in ways other than those charged. In fact, the district court specifically found that Crozier participated in the conspiracy by casing the Kentucky Rite-Aid and distributing drugs in Kentucky. The United States correctly notes that although those acts could fairly be considered for the conspiracy count, they were not charged as substantive offenses in the Eastern District of Tennessee, because they occurred wholly within Kentucky. Additionally, "inconsistent verdicts provide no basis for reversal." *United States v. Gaitan-Acevedo*, 148 F.3d 577, 586 (6th Cir. 1998) (citations omitted).[5]

---

[5] Crozier acknowledges this rule applies to inconsistent jury verdicts, but urges this Court to follow the Second Circuit in adopting a different rule for bench trials. *See United States v. Maybury*, 274 F.2d 899, 903 (2d Cir. 1960). Whatever the merits in Crozier's argument, the district court's verdict was not necessarily inconsistent, as demonstrated above.

unaccompanied by some effort at developed argumentation, are deemed waived . . . ." *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (citations and quotation marks omitted).

We will not allow Burton to argue insufficient evidence as to the "possession of a firearm" charge in his reply brief, simply because he cited generally to 18 U.S.C. § 922 in his initial brief. This is particularly true where Burton's arguments are heavily fact-based. *See Wright*, 794 F.2d at 1156 (finding refusal to hear issue raised for first time in reply brief "particularly appropriate" when the issue "is based largely on the facts or circumstances of the case"). The only argument raised in his initial brief was whether there was sufficient evidence to convict him of robbing the Tennessee Rite-Aid, and we conclude there was.

Crozier also challenges his conviction on the drug conspiracy count. The essential elements of a drug conspiracy are 1) an agreement to violate the drug laws, and 2) each conspirator's knowledge of, intent to join, and participation in the conspiracy. *See United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998). The agreement need not be formal or actual; a tacit or material understanding among the parties is sufficient. *See id.* Further, the defendant "need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999). However, "[a]lthough only slight evidence is needed to connect a defendant to a conspiracy, mere association with conspirators is not enough to establish participation in a conspiracy." *Id.* at 422.

The United States presented the following facts as evidence that Crozier and Burton were involved in a drug conspiracy: 1) Crozier and Burton asked their parole officer for permission to work together; 2) Crozier and Burton were caught on security tape casing the Kentucky Rite-Aid; 3) a ledger was found in Crozier's house reflecting that Burton

the Agreement). If the United States chooses to file a detainer, however, the Agreement's requirements attach.

Once the United States has filed a detainer with another jurisdiction and has made a written request for temporary custody of the defendant, Article IV of the Agreement imposes two significant requirements: (1) trial on the charges must commence within one hundred twenty days of the arrival of the prisoner into federal custody (the "speedy trial" provision); and (2) disposition of the pending charges must precede the return of the prisoner from federal to state custody (the "anti-shuttling" provision). *See* Interstate Agreement on Detainers, § 2, Art. IV(c) and (e).

Burton argues that he arrived in the Eastern District of Tennessee on November 20, 1998, and was not tried until April 5, 1999, one hundred thirty-four days after he entered the jurisdiction. Therefore, Burton contends that his Article IV(c) right to trial within one hundred twenty days was violated, and that dismissal of the indictment with prejudice is the proper remedy. The United States responds that Burton waived his Article IV(c) rights by signing a written waiver in April 1998, requesting a continuance that extended the trial date past the one hundred twenty day deadline, or failing to raise the argument before the district court.

### B. Procedural Issues

The United States contends that Burton signed a written waiver on April 20, 1998, that waived all future claims under the Interstate Agreement on Detainers. We find this argument meritless. On January 12, 1998, pursuant to a writ of *habeas corpus ad prosequendum*, Burton was brought to the Eastern District of Tennessee for his arraignment, and he later requested to be returned to Kentucky pending trial. As a condition of his return, the United States required Burton to sign a waiver of "the defense of a violation of the Interstate Agreement on Detainers in this case, *as it relates to my return to State custody*." (emphasis added). Article IV(e) of the

Interstate Agreement on Detainers, the "anti-shuttling" provision, requires dismissal of an indictment with prejudice whenever a prisoner is returned to the original place of imprisonment before being tried on the indictment in the new jurisdiction. We find the waiver's emphasized language strongly supports Burton's contention that he waived only those claims which could have arisen under the anti-shuttling provision as a result of his pre-trial return to Kentucky.[3]

Alternatively, the United States argues that all claims under the Agreement "relate to" Burton's return to Kentucky, because the United States filed a detainer (and thus became bound by the Agreement's requirements) only as a result of Burton's return. We disagree. The United States could have chosen simply to procure Burton's presence for trial pursuant to a writ of *habeas corpus ad prosequendum*, as it had in April. It was the United States's decision to file the detainer, and not Burton's return to Kentucky, that brought it within the Agreement. Accordingly, we find that Burton's written waiver only waived any Article IV(e) anti-shuttling provision claims that could have arisen as a result of his return to state custody.

The United States makes two additional, closely related waiver arguments. First, it argues that the mere fact that Burton requested a continuance of indeterminate length should constitute a waiver of all procedural and substantive rights guaranteed by Article IV(c). Second, the United States argues that even though Burton did not affirmatively request a trial date outside of Article IV(c)'s one hundred twenty day period, his failure to object to such a trial date constitutes per se waiver. We have never decided whether either a

---

[3]In fact, the United States did not become bound by the Interstate Agreement on Detainers in this case until it filed a detainer with the Kentucky prison on September 10, 1998. Therefore, even without the waiver's limiting language, it is questionable whether Burton could fairly be found to have waived rights that he did not even possess until five months after signing the waiver.

and we therefore decline to dismiss his indictment based on the Interstate Agreement on Detainers.

## IV.

Burton and Crozier both argue that the evidence was insufficient to support their convictions. In reviewing a conviction following a bench trial for sufficiency of the evidence, we decide "whether the evidence is sufficient to justify the trial judge, as trier of facts, in concluding beyond a reasonable doubt that the defendant was guilty." *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir. 1992). "[C]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ferguson*, 23 F.3d 135, 140 (6th Cir. 1994).

Burton cites 18 U.S.C. § 922(g) in his "sufficiency of the evidence" heading in his initial brief to this Court, but that is the first and only time he refers to his conviction for being a felon in possession of a firearm in his initial argument. His brief instead argues that there is insufficient evidence to support the robbery conviction. The United States correctly responds that the district court properly acted as fact-finder in choosing to credit both eyewitnesses' identifications of Burton as the robber. *See United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988). Nonetheless, in his reply brief, Burton goes into great detail about the paucity of evidence with respect to his "felon in possession of a firearm" conviction under 18 U.S.C. § 922(g).

We will generally not hear issues raised for the first time in a reply brief. *See Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 820 F.2d 186, 189 (6th Cir. 1987). "Court decisions have made it clear that the appellant cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in appellee's brief." *United States v. Jenkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989). In fact, "issues adverted to [on appeal] in a perfunctory manner,

defendant's request for a continuance or a defendant's failure to object to a trial date outside of the Agreement's time period automatically waives his Article IV(c) speedy trial rights.

Article IV(c) guarantees that:

> In respect of any proceeding made possible by this article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

The Fifth Circuit has noted that this provision contains five requirements for obtaining a continuance: 1) the court must have competent jurisdiction; 2) the grant of the continuance must be in open court; 3) the defendant or his attorney must be present; 4) the movant must demonstrate good cause in open court; and 5) the length of the continuance must be reasonable or necessary. *See Birdwell v. Skeen*, 983 F.2d 1332, 1336 (5th Cir. 1993). Here, the United States acknowledges that the district court granted the continuance in violation of the second, third, and fourth requirements of Article IV(c) by failing to grant the continuance for good cause shown in open court, with either Burton or his attorney present. Furthermore, although the United States argues that the district court complied with the fifth requirement, that the continuance was granted for a "necessary or reasonable" length of time for all parties within the meaning of the Agreement, it has failed to show any record evidence of that fact. Nonetheless, the United States contends that under *New York v. Hill*, 528 U.S. 110 (2000) (holding defense counsel's agreement to a trial date outside the time period required by the Agreement may constitute waiver), either Burton's request for a continuance waived all of Article IV(c)'s required procedures, in addition to the substantive rights guaranteed by that provision, or alternatively, Burton's failure to object to

---

conclusion on these facts, we would effectively be reading into the statute a per se rule that all defense requests for a continuance automatically waive procedural and substantive Article IV(c) rights, a result contrary to the Supreme Court's reasoning in *Hill*. Accordingly, because Burton did not object to the district court's failure to follow the five requirements for obtaining a continuance, we will review his claim for plain error.

### C. Substantive Issues

To establish plain error, a defendant must show "(1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).

Because four of the five unambiguous procedural requirements were not met, Burton has shown both that an error occurred at the district court and that the error was clear and obvious, the first two prongs of the "plain error" test. Nonetheless, we find that Burton has failed to show that the error also affected his substantial rights and that it seriously affected the fairness of the proceedings (prongs three and four of the "plain error" test). In fact, Burton contends that he need not show prejudice at all. Although we read the Agreement as mandating reversal when the district court fails to literally comply with Article IV(c)'s procedural requirements in response to the *government's* request for a continuance, we see nothing arbitrary about requiring a showing of prejudice when the speedy trial violation arose as a result of the *defense's* motion for a continuance. In any event, Burton's failure to object at trial allows us to review only for plain error, and for Burton to meet that stringent test, he must articulate some effect on his substantial rights as well as on the fairness of the proceedings. He has failed to do so,

the trial date, once assigned, waived all procedural and substantive rights under Article IV(c).

We find that the United States's reliance on *Hill* is misplaced. First, *Hill*'s facts were markedly different than those we are faced with today. In *Hill*, defense counsel did not move for a continuance, but rather accepted an initial trial date outside of the statutory time period.[4] Therefore, Article IV(c)'s procedural requirements for granting a *continuance* arguably did not even apply. Even assuming the Agreement's procedural requirements attached to the initial trial date, those requirements were satisfied in *Hill*, where the trial date was both requested and granted in open court. *See id.* at 112-13. Unlike in *Hill*, Burton's continuance was neither requested nor granted in open court. More importantly, *Hill* expressly rejected the government's argument that agreement in open court to a trial date outside the allowable time period itself satisfies the Agreement's other procedural requirements. "It was suggested at oral argument that agreement in open court to a trial date outside the allowable time period can itself be viewed as a 'necessary or reasonable continuance' for 'good cause shown in open court.' Although an agreed-upon trial date might sometimes merit this description, it is far from clear that it always does so . . . ." *Id.* at 116 n. 1. By leaving open the issue of when an agreed-upon trial date would satisfy the Agreement's procedural requirements, the Supreme Court implicitly rejected the United States's contention that agreeing to a date outside of the Agreement's time period

---

[4]Indeed, *Hill* discussed not Article IV(c), but Article III(a). Although the procedural requirements of the two provisions are the same, they are triggered very differently. Article III(a)'s one hundred eighty day time limit for disposing of pending claims is triggered by a written request from the prisoner for a disposition of the charges after the charging jurisdiction has filed a detainer. In contrast, Article IV(c)'s one hundred twenty day time period is triggered by the charging jurisdiction's decision to take custody of the defendant. Because Article IV(c) is triggered by the unilateral action of the charging jurisdiction, it does not contemplate the same degree of "party control" that the Supreme Court found in Article III(a). *See Hill*, 528 U.S. at 117-18.

automatically waives Article IV(c)'s continuance procedures. *See id.*

We hold that when a putative violation of Article IV(c) occurs, we have an obligation to scrutinize each continuance request made by a defendant to determine whether or not the request amounted to a waiver of the procedural and substantive rights guaranteed by that provision. Nothing in either *Hill* or the Agreement requires us to find as a matter of law that merely requesting a continuance on behalf of a defendant constitutes a per se waiver of all procedural and substantive "speedy trial" rights guaranteed by Article IV(c).

This is not to say that the district court must always comply literally with every procedural requirement enunciated in Article IV(c) when the defendant requests a continuance, although literal compliance is clearly required for continuances requested by the prosecution. *See Hill*, 528 U.S. at 116. For instance, were the defendant to affirmatively waive his or her rights under Article IV(c) in a motion for a continuance, the district court need not literally comply with the procedures prescribed in Article IV(c). Alternatively, if the district court were to explicitly refer to the defendant's "speedy trial" rights under the Agreement, either in its oral or written grant of the defense's motion for a continuance, and the defendant took no action to preserve those rights, he could not then raise the district court's failure to follow procedures as grounds for an appeal. In this case, however, the only evidence that Burton intended his request for a continuance to constitute a waiver of his "speedy trial" rights is the request itself. Because Burton's counsel did not request a specific date, because the continuance was neither requested nor granted in open court, and because there has been no showing that the approximately three-month continuance was either "necessary" or "reasonable" for all parties within the meaning of the Agreement, we cannot conclude that Burton's mere request for a continuance amounted to an intentional abandonment of either Article IV(c)'s procedural safeguards or its substantive rights. Were we to reach the opposite