NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0139n.06
Filed: December 1, 2004

No. 03-1691

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **KENNETH ROY THOMAS,** | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant.* | ) | |

BEFORE:    MARTIN, COLE, and GIBBONS, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.**  Defendant-Appellant Kenneth R. Thomas was

convicted of bank robbery in the United States District Court for the Western District of Michigan.

On appeal, Thomas argues that the district court erred when it: (1) failed to suppress an unduly

suggestive identification; (2) submitted the case to the jury on the element of intimidation; (3)

allowed the prosecution to examine Thomas about his possession of a knife and a crack pipe; and

(4) allowed the prosecution to examine Thomas on the details of prior convictions.  Because we find

that the unduly suggestive identification was reliable under the totality of the circumstances, that

there was sufficient evidence to submit to the jury on the element of intimidation, and that the

examination about the knife and crack pipe as well as the examination on the details of prior

convictions do not rise to the level of plain error, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

On September 23, 2002, a man entered a Bank One branch in Grand Rapids, Michigan, approached a teller window, and demanded "your hundreds, your fifties," and a pack of tens. Tolanda Staten, the teller, testified that the robber ordered her to either "[g]o talk to them," or "[d]on't talk to them," but she was uncertain exactly what he said. Staten was so distraught she forgot bank procedures and her manager's name, but she did give the robber a pack of tens with a dye pack in it. After the robber fled, she shouted to the bank manager that she had been robbed and called the police to give them a description of the robber. Staten described the robber as an African-American man wearing a gray sweatshirt with a nylon jacket underneath.

Police officers apprehended Kenneth Thomas several blocks away, as he was running through a park. An officer testified that as he approached he saw Thomas rubbing his hands on the ground. His hands had red marks and grass stains on them. Between where Thomas was apprehended and the bank, the police found a bicycle, a maroon ski cap, and a gray sweatshirt stained with red dye. They also recovered some money and the exploded dye pack.

Police officers asked several witnesses to identify the suspect. Neither the bank teller nor another bank customer who saw the robber in the parking lot could identify Thomas as the robber.

Troy Short, a former bank employee, was in the bank at the time of the robbery but did not see it happen. After he heard that a robbery had occurred, he looked outside and saw the dye pack explode. He did not, however, see "anybody or anything at that particular time." When he went outside, bystanders told him, "[h]e's going that way." Short looked down the street and saw "an

individual in a white or light-colored sweatshirt and black pants on a bicycle." He testified that this individual was "[q]uite a ways [away]. Probably a half a block, a hundred yards."

Police took Short to where they had apprehended Thomas. Short identified Thomas, who was in handcuffs, as a man he had seen in the bank just prior to the robbery, noting that he was "reasonably sure" his identification was correct. At trial, Short testified that he had seen Thomas enter the bank and had looked right at him. He did not give a pre-identification description, but described the man at trial as wearing black pants and a gray sweatshirt with "some sort of hood over the top - over the top of his head." Short also testified that he had been trained in identification and standard procedures for bank robberies.

Thomas was taken to the jail where he tried to flush currency down the toilet. Prison employees found money in his clothing, on the floor, and inside the toilet. When added to the money recovered by police in the parking lot and on Thomas at the time of his arrest, the total amounted to $3,240, only ten dollars less than the amount stolen from the bank.

At trial, the evidence admitted included a bank surveillance tape and five photographs of the defendant after his arrest. In addition, two inmates testified that Thomas bragged about committing the robbery.

Thomas testified that the money on his person was from a poker game he was playing prior to his arrest. He explained that he ran when someone said there were police in the area. In addition, he testified that he was running at the time of his arrest because four or five people, whom he believed to be drug dealers, were chasing him on bicycles.

## II. ANALYSIS

*A. Motion to Suppress Short's Identification*

We review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001).

At trial, Thomas moved to suppress Short's identification. The trial court denied the motion. The court determined that the "show-up" identification procedure used by the police was unduly suggestive. However, the court determined that under the totality of the circumstances, the identification was reliable.

We agree with the district court that asking Short if Thomas was the individual he had seen in the bank, while Thomas was in handcuffs in police custody, was unduly suggestive. However, we also agree that under the totality of the circumstances, the identification was reliable.

There are five factors to consider when determining whether an identification was reliable under the totality of the circumstances. Those factors are: (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness upon identification; and (5) the length of time between the crime and the identification. *Id.*

In this case, the witness did have an opportunity to view the suspect. Short testified that in the bank he looked "right up into his face, right into his eyes." In addition, Short saw the witness fleeing on his bicycle. Although Short was far away, this second opportunity aided his ability to identify the robber. Thus, even though Short's observation in the bank was relatively brief and his

second observation was from a relatively far distance, we conclude that they provided Short a sufficient opportunity to view the suspect.

Second, Short testified that he paid particular attention to the man he observed in the bank. However, Short could not testify to the reason he paid attention to the man. To analyze the sufficiency of an eyewitness's degree of attention, we generally examine the circumstances surrounding the witness's encounter. We grant more reliability to those encounters that allowed the witness to view the assailant with a "heightened degree of attention, as compared with 'disinterested bystanders or casual observers.'" *Id.* at 511. Generally, we place greater trust in witness identifications made during the commission of a crime because the witness has a reason to pay particular attention to the perpetrator, especially when the witness is in danger. *See United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (finding heightened degree of attention where witness spoke with robber and studied his features while looking for an opportunity to escape); *Crozier*, 259 F.3d at 511 (finding heightened degree of attention where robber confronted the witnesses with a gun).

Short's encounter inside the bank was limited to a time period before the commission of the robbery. He was not held captive by the robber, he was not confronted with a gun, and he did not see the crime occur. He did not have any reason, beyond that of a casual observer, to pay particular attention to the man. Short did testify, however, that he had training in the identification of people. Yet, Short had little reason to engage his identification training since he did not know a crime was about to occur.

Short's second encounter with the suspect was after the crime, when he had a reason to study the suspect. Although Short had more reason to focus his attention on the man, he was at a greater distance and therefore could not see the suspect as clearly. Thus, although Short did testify that he paid particular attention to the suspect and had a reason to study him as he fled on his bike, Short had no particular reason to study the man he saw in the bank prior to the commission of the crime. We therefore find that his period of observation was most consistent with that of a "disinterested bystander or casual observer."

Third, Short did not describe the perpetrator prior to his identification. Although the district court held that this factor was therefore unhelpful, the lack of a pre-identification description weighs in favor of the defendant. "If [the witness] failed to describe [the suspect] before being presented with his photo in a suggestive manner, that fact should not be ignored, but rather cuts in favor of [the defendant]'s argument that [the witness] identified him merely because of the suggestive photo line up." *Crozier*, 259 F.3d at 512. Thus, the police officers' failure to obtain a pre-identification description made the identification less reliable.

The two remaining factors, however, enhance the reliability of the identification and weigh in favor of the district court's finding of sufficient reliability. Short testified that he was "reasonably sure" the man he identified was the man in the bank prior to the commission of the robbery. In our view, this indicates a sufficient level of certainty to support the reliability of Short's identification. Moreover, Short made this identification a short time after he first observed the man, which further supports the reliability of Short's identification.

Weighing all these factors, we find that the identification was sufficiently reliable.

*B.  Sufficiency of Evidence on Intimidation Element*

We review a sufficiency of the evidence claim by viewing the facts in the light most favorable to the prosecution and upholding the verdict if a rational trier of fact could have found the essential elements beyond a reasonable doubt.  *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir. 2000).  Because Thomas did not renew his motion for acquittal for insufficiency of the evidence at the close of proofs, we review only for manifest miscarriage of justice.  *Id.*  A manifest miscarriage of justice can be found only where the "record is devoid of evidence pointing to guilt." *Id.*

> Bank robbery under 18 U.S.C. § 2113(a) is defined in relevant part as follows:
>
> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another . . . any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank . . . .

Thomas argues that there was insufficient evidence to establish the use of force, violence, or intimidation.  There is no evidence that Thomas used, displayed, or implied that he had a weapon. We must therefore determine whether the record is "devoid of evidence" of intimidation.

Intimidation is defined as "conduct and words calculated to create the impression that any resistance or defiance by the teller would be met by force." *United States v. Gilmore*, 282 F.3d 398, 402 (6th Cir. 2002) (citation and internal quotation marks omitted).  The test is an objective one, "whether an ordinary person in the teller's position could reasonably infer a threat of bodily harm from defendant's acts." *Id.*

Little more than a demand for money is required to meet the intimidation element of bank robbery. In *Gilmore*, this court found intimidation where, in a series of bank robberies, a defendant presented demand notes to tellers and sometimes wore an "obviously fake goatee" and sunglasses. *Id.* at 400-01. The court reasoned that "[d]emands for money amount to intimidation because they carry with them an implicit threat: if the money is not produced, harm to the teller or other bank employee may result." *Id.* at 402. Other cases have found intimidation where there was a demand accompanied by something else. *See United States v. Waldon*, 206 F.3d 597, 606 (6th Cir. 2000) (robber wore a mask and ordered everyone to lie down); *United States v. Perry*, 991 F.2d 304, 310 (6th Cir. 1993) (imperative demand accompanied by admonition not to alert anyone and gesture as if reaching into coat to grab something); *United States v. Robinson*, 527 F.2d 1170, 1172 (6th Cir. 1975) (man clothed in a leather coat waited nervously in line, attempted a sham transaction, then demanded all the teller's money and presented a black pouch to the teller). Notably, the additional element in each of these cases was minor, just enough to make clear to the teller that the request for money was not an ordinary bank transaction.

In this case, the robber made an imperative demand for money. He said "Give me your hundreds, your fifties." Although this demand was not on a demand note as in *Gilmore*, the words used by the man implied something other than an ordinary bank transaction. Ordinary bank customers do not demand money. Under the *Gilmore* standard, the demand alone would probably be sufficient to support a finding of intimidation. But even if we interpreted *Gilmore* and our other precedent as requiring some other factor, there was sufficient evidence to establish intimidation. In addition to his demand for money, the robber said to the teller: "Go talk to them" or "Don't talk to

them." Viewed in the light most favorable to the prosecution, it is probable that the robber said "Don't talk to them," a statement that again implied something other than an ordinary bank transaction.

Furthermore, the testimony of the teller supports a finding of intimidation. We have noted before that testimony from tellers that they were afraid is probative of whether an objective person would feel intimidated. *Gilmore*, 282 F.3d at 402. In this case, the teller testified that she was distraught, and that she forgot bank procedures and her manager's name. Although this testimony alone does not conclusively support a finding of intimidation, a rational trier of fact could infer that an objective person would be intimidated by the defendant's words and actions.

The imperative demand for money, combined with the robber's statement to the teller and the teller's testimony of her own intimidation, provided sufficient evidence to submit this element to the jury. Accordingly, there was therefore no manifest miscarriage of justice when the trial court submitted the case to the jury on the element of intimidation.

## C. *Examination of Thomas About Crack Pipe and Knife*

During the trial, the prosecution on cross-examination asked Thomas about a crack pipe and a knife he supposedly possessed during the crime. After Thomas denied possession, the prosecution called two police officers to testify that they had found the crack pipe on Thomas and the knife on the street near where they arrested him. Thomas did not object to this line of questioning. We therefore review for plain error. *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999).

The prosecution may attack a defendant's credibility through questions about specific acts. Fed. R. Evid. 608(b). However, once a defendant denies these acts, the prosecution may not introduce extrinsic evidence to prove those acts occurred. *Id.*

Even if the admission of this testimony was erroneous, it certainly did not affect his substantial rights in light of all the other evidence, and therefore it would not rise to the level of plain error. *See Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (requiring an error to affect substantial rights and seriously affect the fairness and integrity of any judicial proceedings for reversal on the basis of plain error).

Other evidence in this case included a bank videotape of the robbery, identification by a bank customer, $3,240 recovered from the defendant and the parking lot when $3,250 were stolen from the bank, and testimony from the defendant's cellmates that he bragged about the robbery. In addition, prison employees testified that Thomas tried to flush money down the toilet in his cell. Finally, when the police stopped him, the defendant was running and had left a trail of items behind him including a bicycle and layers of clothing. This overwhelming evidence of guilt outweighs any prejudice caused by the admission of evidence of the crack pipe and knife. Therefore, we do not find plain error.

## D. *Examination of Thomas About Details of Prior Convictions*

At trial, the prosecution also asked Thomas about the details of prior convictions. Specifically, the prosecution questioned Thomas about his use of a gun during the commission of a prior robbery. Thomas did not object, so we again review for plain error. *Wilson*, 168 F.3d at 920.

Counsel may question a witness, including a defendant, about prior convictions to impeach the witness's credibility. Fed. R. Evid. 609(a)(2). Generally, this examination should be limited to the conviction, not details of the circumstances surrounding conviction. *United States v. Turner*, 995 F.2d 1357, 1363-64 (6th Cir. 1993).

Here, it is not clear why the district court allowed the prosecution to question Thomas about his use of a firearm during his prior conviction. Thomas never testified on direct examination that he did not commit the robbery. Thus, the question about the firearm did not go to his credibility. Again, even if the court's failure to bar this line of questioning was error, there was sufficient reliable evidence such that the error did not affect his substantial rights. Therefore, we do not find that any error rose to the level of plain error.

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court**.**