**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph CHARACTER, Defendant–Appellant.**

**No. 01–2450.**

United States Court of Appeals, Sixth Circuit.

Sept. 25, 2003.

**692**

Kathleen Moro Nesi, Asst. U.S. Attorney, Detroit, MI, for Plaintiff–Appellee.

Joseph Character, pro se, Cumberland, MD, Kevin M. Schad, Schad & Cook, Indian Springs, OH, for Defendant–Appellant.

Before DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

A jury convicted Joseph Character of one count of conspiracy with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and one count of using a telephone to facilitate a drug conspiracy, in violation of 21 U.S.C. § 843(b). He raises seven issues on appeal, each of which we reject. The judgment, accordingly, is AFFIRMED.

## I. BACKGROUND

A Drug Enforcement Administration (DEA) investigation uncovered a cocaine trafficking conspiracy involving activity in Michigan, New York, and North Carolina and involving a Detroit-based drug dealer named David Hemphill. In the course of investigating this narcotics distribution network in the summer of 1998, DEA Agent Donald Grace intercepted telephone conversations indicating that Joseph Character, the defendant in this case, actively participated in Hemphill's cocaine conspiracy.

Following this lead as well as a tip that a narcotics delivery from Michigan to North Carolina was imminent, Greensboro law enforcement authorities conducted surveillance of Character's North Carolina residence on July 22, 1998. After observing suspicious activity, officers knocked on the apartment door, identifying themselves to Character (who answered the door) and explaining to him that they had received a narcotics complaint. The officers eventually conducted a "protective sweep" of his apartment while awaiting a warrant, and arrested Character after finding more than four kilograms of fake cocaine, narcotics tab sheets, and false identification documents, along with firearms and ammunition, a digital scale bearing traces of real cocaine, and lyrics to a rap tune that Character wrote referencing drugs, money and

guns. Character was charged with possession with intent to distribute a counterfeit controlled substance under 21 U.S.C. § 841(a)(2). Unable to post the required bond, he was incarcerated pending trial.

While Character was in jail and before he could post a bond, DEA agents wiretapped telephone conversations involving Character and other participants in the conspiracy. These conversations revealed that Character's apartment still contained a package of real cocaine, which had not been discovered at the time of Character's arrest during the search of his apartment on July 22, 1998. On July 25th, in one of these conversations, Character telephoned Byram Richardson, instructing him to remove the cocaine from the dishwasher. Richardson went to Character's apartment, removed the cocaine, and placed it in a nearby tree. At Richardson's urging, still another individual, who remains unidentified, retrieved the cocaine from the tree.

On November 3, 1999, in view of this evidence, a grand jury sitting in the Eastern District of Michigan returned a Fourth Superseding Indictment charging Character with one count of conspiracy to possess with intent to distribute controlled substances, violating 21 U.S.C. § 846, and one count of using a telephone to facilitate a drug conspiracy, violating 21 U.S.C. § 843(b). (The United States eventually dropped the counterfeit narcotics charge against Character.) On August 21, 2000, a jury convicted Character on both counts. And, on October 4, 2001, the District Court sentenced Character to a 162–month prison term on count one and a 48–month concurrent prison term on count two.

Character raises seven claims on appeal: (1) insufficient evidence to convict him on the drug conspiracy charge; (2) a flawed indictment that failed to include an element of the offense; (3) improper venue in the Eastern District of Michigan; (4) an improper instruction under Rule 404(b) of the Federal Rules of Evidence; (5) ineffective assistance of counsel; (6) a fatal variance between the indictment and the proof presented; and (7) sentencing errors in calculating the amount of cocaine at issue and in determining that a firearm was used in connection with the crime.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence on the Conspiracy Charge

Character initially challenges the sufficiency of the evidence on count one, the conspiracy charge. While Character unsuccessfully raised this challenge under Rule 29 of the Federal Rules of Criminal Procedure at the close of the Government's case, he did not renew the motion at the close of all other evidence. That failing imposes a heavy burden on his appeal. "Absent a showing of a manifest miscarriage of justice, this court will not review a district court denial of a Rule 29 motion where a defendant does not renew that motion at the close of all the evidence." *United States v. Williams*, 940 F.2d 176, 180 (6th Cir.1991). "[A] 'miscarriage of justice,'" we have said, "exists only if the record is 'devoid of evidence pointing to guilt.'" *United States v. Mack*, 159 F.3d 208, 216 (6th Cir.1998) (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir.1998)).

██  No such gap in the evidence exists here. Under 21 U.S.C. § 846, the essential elements of the crime are: "(1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator." *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir.1998). Viewed in the Government's favor, as it must be, the

evidence establishes that a rational trier of fact could have found each of these elements of the crime beyond a reasonable doubt, see United States v. Riffe, 28 F.3d 565, 567 (6th Cir.1994), and accordingly that the record is not devoid of evidence of guilt.

At trial, the United States introduced evidence of several recorded telephone conversations occurring in both Michigan and North Carolina demonstrating Character's involvement in a cocaine conspiracy with Hemphill. DEA Agent Grace, qualified as an expert in drug trafficking, testified that these conversations revealed that Hemphill regularly sent cocaine to North Carolina for Character to distribute, after which Character would return the proceeds to Hemphill and other co-conspirators. When surveillance confirmed Agent Grace's tip regarding the arrival of specific Michigan-registered vehicles and an apparent narcotics delivery to Character's apartment, Greensboro police arrested Character and searched his apartment. During the search, they seized a scale containing traces of cocaine, among other incriminating items. Later, taped telephone conversations of Character from his jail cell provided further evidence of guilt. In those conversations with other co-conspirators, Character (1) expressed concern about cocaine still in his apartment, (2) asked Byram Richardson to remove the cocaine, and (3) discussed with Hemphill how police could have discovered he was involved in the drug conspiracy. Richardson worried aloud during the taped conversation that Character's instructions were so direct that anyone wiretapping the conversation would know that cocaine remained hidden in the dishwasher in Character's house. Notably, based on these same conversations, Richardson pled guilty to participating in a drug conspiracy. All told, these pieces of proof adequately establish that the record in this case is not

"devoid of evidence pointing to guilt" on the drug-conspiracy charge.

Nor does United States v. Layne, 192 F.3d 556 (6th Cir.1999), upon which Character relies, alter this conclusion. In overturning Layne's conviction for conspiracy to "'manufacture, distribute, and possess with intent to distribute crack cocaine,'" the Court determined that the Government had failed to prove a conspiratorial agreement. Id. at 568–69 (emphasis added). There, however, the only evidence of the conspiracy consisted of a single witness's testimony that the defendant gave her, as opposed to sold her, crack cocaine and that she saw others using, as opposed to buying, crack cocaine at the defendant's house. Id. A comparison between Layne and this case gives analogy a poor name. Here, after all, the evidence consisted not just of cocaine located in Character's apartment but also of phone calls discussing cocaine deliveries to North Carolina and the return of drug proceeds to Detroit, as well as references to specific transactions, to dollar amounts received, and in one instance to a concern about whether a full delivery had been made. This evidence more than suffices to uphold the conviction and distinguish the case from Layne.

## B. Flawed Indictment

Character next claims that the indictment failed to include an element of the conspiracy offense because it did not charge the type and quantity of drugs—more than 500 grams of cocaine—for which he was later held responsible at sentencing. Since the District Court rather than a jury thereafter determined the amount of drugs for which he was held responsible, Character argues that his conviction must be vacated.

■ Character is factually correct but legally mistaken in his argument about the quantity of drugs at issue. The indictment did expressly charge Character for participation in a drug conspiracy, and it did not specify the quantity of cocaine for which he was responsible. (JA at 18). But the elements of this conspiracy do not require the prosecution to specify the quantity of drugs at issue. In this instance, the indictment correctly included both essential elements of the conspiracy. (JA at 17–18). *See Maliszewski*, 161 F.3d at 1006.

■ Contrary to Character's argument, *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), does not alter this conclusion. "Other than the fact of a prior conviction," *Apprendi* holds, "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348 (emphasis added). Here, however, the District Court found Character responsible for greater than 500 grams of cocaine and sentenced him to 162 months imprisonment, (JA at 577), well below the twenty-year statutory maximum for conspiracies in which no quantity of drugs is specified in the indictment. 21 U.S.C. § 841(b)(1)(C). Since the imposed penalty falls below the statutory maximum, *Apprendi* does not advance Character's argument.

Character next contends that his indictment fails to mention the *type* of drug involved in the conspiracy. He is factually mistaken, however. The Fourth Superseding Indictment expressly charges him with a *cocaine* conspiracy.

## C. Venue

Character next challenges venue, arguing that the charges did not have an adequate connection to, and therefore did not belong in, the Eastern District of Michi-

gan. Character, however, waived his right to request a change of venue by failing to raise the issue in the District Court. Since there was no objection in the District Court, we review only for plain error. *United States v. Collins*, 78 F.3d 1021, 1033 (6th Cir.1996). "Plain error is defined as an egregious error, one that directly leads to a miscarriage of justice." *United States v. Frazier*, 936 F.2d 262, 266 (6th Cir.1991) (quoting *United States v. Busacca*, 863 F.2d 433, 435 (8th Cir.1988)). To establish plain error, the defendant must show that: (1) an error occurred, (2) it was indeed plain, (3) it seriously affected the defendant's substantial rights, and (4) it called into question the fairness and fundamental integrity of the trial. *See United States v. Vincent*, 20 F.3d 229, 234 (6th Cir.1994).

■ Character has not met this daunting standard. In a drug conspiracy case, venue is proper in any district court where an overt act in furtherance of the conspiracy occurs, *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir.2001), and the Government need only prove venue by a preponderance of the evidence, *id.* While the evidence demonstrates that Character distributed cocaine in North Carolina, it also shows the cocaine was sent to North Carolina from the Eastern District of Michigan and that Character sent drug proceeds from North Carolina back to Michigan. Though Character, himself, may never have entered Michigan to commit an overt act during the conspiracy, it is enough that a coconspirator (such as Hemphill) committed an overt act furthering the conspiracy within the district. *Id.* Hemphill's actions and participation in the conspiracy, moreover, remove this case from the orbit of *United States v. Williams*, 274 F.3d 1079, 1084–85 (6th Cir.2001), where the only evidence connecting the drug conspiracy to Michigan came from the statement

of an undercover agent, who of course was not a co-conspirator and who knew the drugs in fact would never reach Michigan. In the end, no plain error occurred here; venue was proper in the Eastern District of Michigan.

## D. Rule 404(b) Instruction

Character next challenges the trial court's Rule 404(b) jury instruction regarding the jury's assessment of evidence of prior "bad acts" introduced against him. As an initial matter, this contention (like several others) faces a waiver problem. Before giving this instruction, the District Court gave Character an opportunity, in accordance with Rule 30 of the Federal Rules of Criminal Procedure, to object to the instruction outside of the jury's presence. Character's counsel, however, found the instruction "suitable," and made no objection. (JA at 491–92). "Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." Fed.R.Crim.P. 30(d). As noted above, Rule 52(b), in turn, establishes that only "[a] plain error that affects substantial rights may be considered" in this setting. Fed.R.Crim.P. 52(b).

Character's conclusory arguments in support of this contention have not shown that an error, in the first instance, occurred. The Rule 404(b) instruction, it initially is worth pointing out, was designed to help Character, not to hurt him. The need for an instruction arose when Character chose to testify and when, among other things, he discussed some evidence found in the initial seizure (e.g., the fake cocaine) but not other evidence (e.g., fraudulent identification documents). In view of Character's testimony, the District Court allowed the Government on rebuttal to challenge the veracity of Character's statements by introducing incriminating evidence from the protective sweep

that the District Court previously had suppressed and by allowing the Government to question Character about this evidence.

Even then, moreover, it was the Government, not Character, that sought the Rule 404(b) instruction. It did so after closing arguments and after the court's initial instruction to the jury in order to ensure that the previously suppressed evidence was properly interpreted by the jury. Thereafter, the District Court offered a special Rule 404(b) instruction to the jury, cautioning that it consider this evidence only in relation to Character's explained state of mind. (JA at 489–91). *See United States v. Ward,* 190 F.3d 483, 490 (6th Cir.1999). The instruction adequately served this important purpose, and Character offers no reasoned explanation why it did not.

■ Trying to prove that the instruction was in fact prejudicial, Character points out that the jury returned a verdict in less than thirty minutes after the special instruction was given. But that development no more establishes that the instruction was unfair than it does that Character was particularly guilty. The relevant point is that the instruction sought to ensure that "bad acts" evidence, which came in only as a result of Character's testimony, was properly assessed by the jury. Nothing about the terms of the instruction suggests that this did not happen, and the instruction accordingly does not afford a basis for reversal.

## E. Ineffective Assistance of Counsel

In his legal brief to this Court, Character argues that he received ineffective assistance during the trial. At oral argument, however, counsel for Character indicated that the Court need not address this claim in light of *Massaro v. United States,* —— U.S. ——, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), which holds that in-

effective-assistance claims may be brought in the first instance in a collateral challenge to a federal conviction under 28 U.S.C. § 2255, *Massaro,* —— U.S. at ——, 123 S.Ct. at 1694, and which notes that such claims "ordinarily will be litigated in the first instance in the district court" under § 2255. *Id.* In view of *Massaro* and in view of Character's decision to withdraw this argument from his direct appeal, we do not address it.

F. Variance

Character next claims that a fatal variance existed between the conspiracy alleged in the indictment and the conspiracy proved at trial. "A variance occurs when ... 'the evidence at trial proves facts materially different from those alleged in the indictment.'" *United States v. Barrow,* 118 F.3d 482, 488 (6th Cir.1997) (quoting *United States v. Hathaway,* 798 F.2d 902, 910 (6th Cir.1986)). To reverse a conviction on this ground, Character must establish the existence of a variance in proof and show how it affected his substantial rights. *See United States v. Kelley,* 849 F.2d 999, 1002 (6th Cir.1988). Not every variation between indictment and proof at trial, however, establishes reversible error. Only variances that create a "substantial likelihood that a defendant may have been convicted of an offense other than that charged by the grand jury require reversal." *United States v. Feinman,* 930 F.2d 495, 499 (6th Cir.1991) (internal quotations omitted). That burden is heightened by the failure of Character's counsel to present this claim to the District Court. Under these circumstances, Character must establish a miscarriage of justice to obtain relief. *See United States v. Horry,* 49 F.3d 1178, 1179 (6th Cir.1995). He has not done so.

■ Character argues that the Fourth Superseding Indictment charged only himself and Richardson by name as co-conspirators and that Richardson, by his own testimony, never knew that Character was involved in drugs and did not have an agreement with Character to distribute drugs. But the evidence is otherwise. It shows that Richardson and Character, at a minimum, had an agreement with Hemphill and an unidentified fourth party to retrieve cocaine hidden in the dishwasher of an apartment that was being used to distribute cocaine delivered from Michigan to North Carolina. (JA at 320–25). Richardson, notably, later pled guilty to participating in a conspiracy with Character to distribute drugs based on this evidence. (JA at 322). Additionally, the indictment includes "others some of whom are named in the Third Superseding Indictment in this cause." (JA at 17–18). David Hemphill is one of the named defendants in the Third Superseding Indictment. (JA at 9). This argument, in short, has neither an accurate factual premise to support it nor an accurate legal one.

Next, in a variation on the theme of his venue and sufficiency-of-the-evidence arguments, Character claims that there is no evidence linking him with anyone who committed overt acts in furtherance of the conspiracy in the Eastern District of Michigan, and that he was in North Carolina at all relevant times. Character, however, did not need to commit an overt act or even to enter the district during the conspiracy in order legally to be a part of it. *See United States v. Crozier,* 259 F.3d 503, 519 (6th Cir.2001) (noting that in drug conspiracies venue is proper in any district where the conspiracy was formed or where an overt act in furtherance of it was performed). In this instance, Hemphill committed overt acts in the Eastern District of Michigan, both when he sent cocaine from Detroit to North Carolina and when he received the proceeds from the sales.

Character also contends that the District Court should have disallowed any evidence related to Hemphill's suppliers in New York, California, and Michigan because it amounted to evidence of separate conspiracies. Hemphill's activities in other states, however, serve as evidence of the overall conspiracy charged. As this Court has recognized, each co-conspirator need not participate in all phases of the venture. "It is often possible, especially with drug conspiracies, to divide a single conspiracy into sub-agreements.... The key is to determine whether the different sub-groups are acting in furtherance of one overarching plan." *United States v. Ghazaleh*, 58 F.3d 240, 245 (6th Cir.1995). A cognizable single conspiracy thus does not degenerate into impermissible multiple conspiracies simply because each individual conspirator(1) does not know every other member and (2) is not aware of or involved in all of the activities that further the conspiracy. *See United States v. Moss*, 9 F.3d 543, 551 (6th Cir.1993). Character may not have participated in all aspects of the general conspiracy, but there is little question that his actions furthered the conspiracy's overriding (and improper) objectives. On this record, a variance between the indictment and the evidence presented at trial does not exist.

## G. Sentencing

Character lastly argues that the District Court erred in calculating his sentence. In his view, the evidence does not show that he was responsible for 500 or more grams of cocaine, and it does not show that the weapons found in his apartment were his or were connected to drug trafficking activity. "Findings of fact relating to sentencing, including the quantity of drugs attributed to a defendant, are reviewed by this court under a clearly erroneous standard." *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir.1996). Likewise, when considering a sentencing enhancement, " '[a] district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous.' " *United States v. Maliszewski*, 161 F.3d 992, 1017 (6th Cir.1998) (quoting *United States v. Washington*, 127 F.3d 510, 515 (6th Cir.1997)).

### 1. Amount

■ Character's Presentence Report held him responsible for 613.4 grams of cocaine. (JA at 579). After a series of hearings, the District Court found him responsible for more than 500 grams through the following calculation: the court found 500 grams based on a recorded telephone conversation on July 21, 1998, two days before the first arrest of Character (JA at 549–50); it found four ounces based on the cocaine left in the dishwasher and mentioned in a jail-cell telephone conversation on July 25, 1998 (JA at 558–59); it found approximately one ounce based on a "fourteen and a half" payment figure mentioned in a pre-arrest telephone conversation on July 16, 1998 (JA at 536–37); it found at least one ounce based on a $1,500 partial payment mentioned in the earlier-referenced July 21, 1998 telephone conversation (JA at 550–51); and it found one ounce based on a $1,600 payment mentioned in another jail-cell telephone conversation on July 25, 1998 (JA at 561–62).

Character argues that these calculations contain three errors. First, the court failed to deduct a purportedly "missing" twenty-two grams from the 500 grams discussed in the July 21st telephone conversation. Second, the court mistakenly credited the testimony of a DEA agent regarding his estimate of the amount of cocaine in the dishwasher. Third, the court should not have found Character responsible for quantities of cocaine sold based on conversations about the transfer of money,

not drugs. We consider each claim in turn.

### a. Conversation about 500 Grams of Cocaine

Character and Hemphill discussed the 500–gram transaction in a conversation on July 21, 1998. Although Character worried during the conversation that an order was "twenty-two gees shy," Hemphill assured Character that he delivered all "five hundred. It show[ed] five hundred on the black box." (JA at 52). The District Court found that this conversation referred to a 500–gram cocaine transaction and that the black box was the digital scale containing cocaine residue that the officers had found in Character's apartment. (JA at 513–15). Thus, at sentencing, the District Court found by a preponderance of the evidence that Character "[wa]s responsible for five hundred grams of cocaine distribution. . . ." (JA at 549–50). In view of Hemphill's statement, Character has not shown that this finding is erroneous, much less clearly so.

### b. Cocaine in the Dishwasher

In concluding that there were four ounces of cocaine in the dishwasher, the District Court relied on two sources of evidence. The first was Richardson's testimony, which described the approximate length, width, and height of the sandwich bag he retrieved from the dishwasher. (JA at 508–09). The second was Agent Grace's opinion, which was based on the information obtained from Richardson and on Grace's knowledge of cocaine, accumulated over numerous years of experience as a DEA Agent. (JA at 510). The District Court permissibly accepted Grace's testimony, finding "that this evidence shows, and all of Richardson's testimony shows, that the cocaine that was retrieved was, in fact, cocaine. . . . It was reasonably approximately four ounces of cocaine, about a hundred, hundred and thirteen grams, which is the approximate weight of four ounces." (JA at 558–59). In view of Richardson's testimony and Agent Grace's testimony, Character has not established reversible error with respect to this finding either.

### c. Price Quotes

### 1. The "fourteen and a half" money figure

On July 16, 1998, an unidentified individual discussed paying the "fourteen and a half" he owed Hemphill through "Joe"— which, recall, is Character's first name. (JA at 50). DEA Agent Grace interpreted the conversation as relating to a cocaine debt of $14,500, or a purchase of approximately 500 grams of cocaine. (JA at 518–19). He did acknowledge that if fourteen and a half meant $1,450, then the conversation would refer just to one ounce of cocaine. (JA at 527). At sentencing, the District Court accepted Character's argument that "fourteen and a half" referred to $1,450 (JA at 532–33), then explained

> that this conversation was a conversation as a part and parcel of the conspiracy. . . . Joe—and that is the defendant here, was an integral part of the sending and/or receiving the . . . payments, which were payments for cocaine. Nine hundred dollars in one transfer, an additional sum of money in a second transfer, adding up to $1,450, which fairly enough approximates a one-ounce transaction of cocaine, and the evidence by a preponderance does inferentially relate to a payment for cocaine by that preponderance of evidence that is required. (JA at 536–37).

Character argues that this figure was encompassed in the 500–gram transaction, and its independent inclusion here amounts to double counting. No other conversation, however, discusses a transac-

tion owing "fourteen and a half." And the 500–gram transaction was paid in full and discussed in a separate conversation five days later on July 21, 1998. (JA at 52). The trial court's rejection of this double-counting argument thus is not clearly erroneous.

### 2. The $1,500 partial payment

In the same July 21, 1998 conversation concerning the 500–gram cocaine purchase, Character and Hemphill also discussed a pending transaction with "Ralph." (JA at 52). Hemphill assured Character that Ralph would have "about fifteen, if not all of it." *Id.* DEA Agent Grace interpreted this reference to mean either a $1,500 or a $15,000 payment-the smaller dollar amount representing the approximate price of one and a half ounces of cocaine. (JA at 515–16). The District Court found that the conversation referred to a $1,500 payment, and that this amount "is more than adequate to purchase an ounce of cocaine." (JA at 550–51). This transaction, the evidence shows, was separate from the 500–gram transaction and from the "fourteen and a half" transaction. The finding is not clearly erroneous.

### 3. The $1,600 payment

In a July 25, 1998 conversation, Character told Hemphill about an individual who delivered "a thousand" one day and an additional "six hundred" the next morning. Crediting DEA Agent Grace's interpretation, the District Court found that this conversation referred to "a distribution of cocaine and payment for it, amounting to approximately $1,600, which relates to approximately one ounce of cocaine." (JA at 561–62). This conversation occurred on a different date from the others, and the monetary amount discussed in it differs from the amounts referenced in the other conversations. In treating this transaction as a separate one for sentencing purposes, the District Court did not clearly err.

### 2. Weapons Enhancement

Character also insists that the evidence does not satisfactorily link the weapons found in his apartment to the overall drug conspiracy, particularly since the officers did not find drugs on the premises. For this reason, he objects to the two-level enhancement given to his sentence.

"If a dangerous weapon (including firearm) was possessed" by an individual involved in drug trafficking or possession, a two-level sentence enhancement is required. U.S.S.G. § 2D1.1(b)(1). This enhancement "reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* cmt. n. 3.

Character notes that this Court has previously rejected sentencing enhancements due to the discovery of firearms on the premises of defendants found guilty of drug trafficking when there was insufficient evidence connecting the firearms to the drugs. *See United States v. Zimmer,* 14 F.3d 286, 291 (6th Cir.1994) (finding no evidence linking weapons in one room of a house to marijuana in another room); *United States v. Peters,* 15 F.3d 540, 546 (6th Cir.1994) (finding insufficient evidence connecting a loaded pistol, hidden in the dresser of a room in which cocaine base was in plain view, to a drug-trafficking offense).

Contrary to the facts in these cases, however, the District Court's findings of fact adequately connect Character to the weapons and the drug conspiracy. In one of the recorded telephone conversations, Character refers to the "heaters" found in *his* apartment. (JA at 523–34). Other items found in his apartment included the scale with cocaine residue and the fake cocaine. In determining that all of this evidence sufficed to connect the weapons to Character and drug trafficking, the

District Court noted "the proximity [of] the scale which had cocaine residue on it" to the weapons as well as "the presence of sham narcotics." (JA at 571). This evidence adequately connected the weapons to the drug conspiracy and Character. In light of this evidence, we need not consider whether it was appropriate for the District Court also to rely on the words of the seized rap song that Character wrote–and the parallel between the number of bullets (seventeen) in the seized weapon and the number of bullets (seventeen) mentioned in the gun identified in the song—in making this sentencing determination. No clear error occurred with respect to the ultimate enhancement.

## III. CONCLUSION

For the foregoing reasons, we reject each of Character's claims on appeal and affirm the judgment of the District Court.